863 So.2d 530 (2003)
Giselle M. BOUTTE, Individually and on Behalf of Jasmine R. Boutte
v.
Brian KELLY, The City of New Orleans and the New Orleans Police Department.
Brian Kelly
v.
The Estate of Warres Boutte; Gisille M. Bouttee, as Administratrix of the Estate of Warres Boutte, III; and Colonial Lloyds Insurance Company.
Ivy Jean Williams, as Permanent Curator and Representative of Janet Williams; and Janet Williams, through her Permanent Curator and Representative, Ivy Jean Williams
v.
Bryan Kelly; The City of New Orleans; The New Orleans Police Department; Giselle M. Boutte, as Administratrix of the Succession of Warres J. Boutte, III; and Colonial Lloyds Insurance Company.
Ivy Jean Williams, as Permanent Curator and Representative of Janet Williams; and Janet Williams, through her Permanent Curator and Representative, Ivy Jean Williams
v.
Bryan Kelly; The City of New Orleans; The New Orleans Police Department; Giselle M. Boutte, as Administratrix of the Succession of Warres J. Boutte, III; And Colonial Lloyds Insurance Company.
Nos. 2002-CA-2451, 2002-CA-2452, 2002-CA-2453, 2003-CA-0436.
Court of Appeal of Louisiana, Fourth Circuit.
September 17, 2003.
*536 Camilo K. Salas III, Jack M. Alltmont, Joy Goldberg Braun and Shirin E. Harrell, Sessions, Fishman & Nathan, L.L.P., New Orleans, LA, Counsel for Janet Williams; Edna Williams as Curatrix and Representative of Janet Williams; and Janet Williams, through her Curatrix and Representative, Edna Williams.
John D. Sileo, Allan Berger & Associates, P.L.C., New Orleans, LA, Counsel for Giselle M. Boutee, Individually and on Behalf of her Minor Child, Jasmine Boutee.
Carl J. Giffin, Jr., and Howard B. Kaplan, Bernard, Cassisa, Elliott & Davis, Metairie, LA, and Paul V. Cassisa, Jr., Bernard, Cassisa, Elliott & Davis, A PLC, Oxford, MS, Counsel for General Motors Corporation.
Charlene C. Larche, Assistant City Attorney, John E. Smith, Deputy City Attorney, Albert A. Thibodeaux, Chief Deputy City Attorney, Sherry S. Landry, Acting City Attorney, New Orleans, LA, Counsel for Bryan Kelly and the City of New Orleans.
(Court Composed of Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY, and Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
These consolidated appeals arise out of an automobile accident that occurred at the intersection of Elysian Fields Avenue and Gentilly Boulevard in New Orleans, Louisiana. After considering the record and the evidence contained therein, we affirm in part, reverse in part, amend the judgment, and render.
At approximately 4:00 a.m. on 18 May 1991, Warres Boutee and his fiancée, plaintiff Janet Williams, were riding in Mr. Boutee's 1982 Oldsmobile Cutlass Supreme, which he had purchased used approximately eighteen months earlier. They had gone out to a local club to dance and then to a Denny's Restaurant in eastern New Orleans for breakfast. At the time of the accident, Mr. Boutee was driving Ms. Williams home. They were traveling north on Elysian Fields Avenue, and as they traversed the eastbound lanes of Gentilly Boulevard, the Cutlass was struck at its right front corner by a New Orleans police tow truck driven by defendant Brian Kelly, which was heading westbound on Gentilly Boulevard.
As a result of the impact, the Cutlass rotated counterclockwise. Mr. Boutee struck the steering wheel with his chest, severing his aorta and killing him within one to two minutes. Ms. Williams sustained numerous injuries, the most serious of which being a closed head injury, known as "diffuse axonal injury" ("DAI"), as evidenced by a horizontal cut to the right side of her head just above the ear. As a result of the DAI, Ms. Williams has right side spasticity rendering her wheelchair bound and depriving her of almost all usage of her right arm, hand, and leg. She also suffers from serious and permanent cognitive deficits, blurred vision, and daily tremors. It is undisputed that her condition will never improve to her pre-accident state of mind and body.
Through her court-appointed curator, Ms. Williams sued the city of New Orleans ("the City") for the alleged negligence of the tow-truck driver, Mr. Kelly.[1] She also *537 sued General Motors Corporation ("GM") for the particular design of its seatbelt restraint system, which she alleged could inadvertently become dangerously slack and, therefore, ineffective. As a result of the seatbelt design and lack of appropriate warning, Ms. Williams alleged that her body was permitted to move freely during the crash and caused her to strike her head inside the vehicle, causing the brain injury.
A bifurcated trial was held with the judge determining the liability of the City and the jury determining the fault of the private parties.[2] While the judge found the City free from fault, the jury allocated forty percent of the fault to the City's tow truck driver as part of its duty to apportion damages. It also assigned forty percent fault to Mr. Boutee. In addition, the jury found that Ms. Williams sustained enhanced injuries as a result of the restraint system that was unreasonably dangerous due to an inadequate warning, thereby assigning GM twenty percent of the fault.[3]
The trial court entered judgment in favor of the City and judgment in favor of Ms. Williams and against GM for fifty percent of the jury's award on 16 July 2002.[4] Both GM and Ms. Williams have appealed from the judgment and have assigned numerous errors for the court's consideration.
GM has assigned nine specifications of error:
1. Ms. Williams' damages were not caused by an inadequate warning;
2. Ms. Williams was not wearing a seat belt at the time of the crash;
3. The jury was improperly charged with incorrect law that reduced the plaintiffs' burden of proof on crucial issues and shifted the burden of proof to GM on other issues;
4. The trial court improperly excluded evidence that tainted the jury verdict;
5. The trial court should have granted a mistrial or new trial due to an extremely prejudicial statement by the plaintiffs' lawyer;
6. The $1,000,000.00 award for future medical expenses was not supported by the evidence;
7. The trial court committed legal error when it increased the amount of the plaintiffs' damages by signing an amended judgment after the court signed an order for suspensive appeal and lost jurisdiction; and
8. The trial court committed legal error when it ordered GM to pay 50% of the damages.
The plaintiffs have assigned the following specifications of error:
1. The trial court erred in failing to find that the City was partially at fault in causing the accident;
*538 2. The jury erred in failing to find that the GM belt system was unreasonably dangerous in design;
3. The jury erred in not assessing GM at least 75% fault in causing Ms. Williams' injuries; and
4. The award of general damages in the amount of $2,000,000.00 was abusively low given the undisputed severity and permanence of Ms. Williams' injuries.
Before addressing the assignments of error, we first resolve the issue of the appropriate standard of review to be applied by the court. GM maintains that the court should perform a de novo review with respect to all issues presented, not only because of the inconsistent verdicts, but also because of other errors made by the trial court. On the other hand, the plaintiffs contend that de novo review applies only to the issue(s) addressed in the inconsistent verdict, i.e., the liability of the City versus Mr. Boutee, but that the rest of the factual matters should be review under the manifest error/clearly wrong standard.
Generally, the findings of the judge or jury will not be disturbed unless they are manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). That standard is arguably inapplicable in this case because a bifurcated trial was held, which resulted in inconsistent findings of fact by the trial judge and jury.
However, the proper standard of appellate review in bifurcated trials with inconsistent verdicts is not a settled question. A split exists in the circuits regarding the proper standard. This court has held that the proper standard is a de novo review of the record, without according any weight or deference to the factual findings of the judge or jury. McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4 Cir.1992), writ denied 595 So.2d 655 (La.1992). However, the first, second, and third circuits have adopted a different standard which accords deference to the factual findings of the judge and jury and attempts to harmonize inconsistent results. Thornton v. Moran, 348 So.2d 79 (La.App. 1 Cir.), writ denied, 350 So.2d 897 (La. 1977); Eppinette v. City of Monroe, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658; Davis v. Witt, 2001-894 (La.App. 3 Cir. 11/13/02), 831 So.2d 1075; Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3 Cir. 1987), writs denied 522 So.2d 562, 563 (La.1988).
Thus, only this circuit has required an independent review without according any weight to the factual findings of the judge or jury; therefore a result different than the decision by the judge or the jury is possible. The other circuits merely decide whether the judge or jury made a more reasonable finding. Writs from First, Third and Fourth Circuit cases have been denied by the Supreme Court and the divergent opinions continue. McCullough, 593 So.2d at 735.
Shortly before the case was heard in this court, counsel for Ms. Williams brought the case of Picou v. Ferrara, 483 So.2d 915 (La.1986) to the court's attention. There, the Supreme Court found that an erroneous jury instruction probably contributed to a finding of the plaintiffs' negligence and, therefore, that finding was not entitled to review under the manifest error rule.
We therefore proceed to determine plaintiff's contributory negligence, without regard to that finding by the jury which was tainted by the erroneous instruction on the issue, but with due regard to the untainted finding by the jury that defendant made a left turn from the right lane at a time when it was unsafe to do so.
Id. at 918.
Applying Picou, de novo review would apply only to the inconsistent verdict *539 regarding the liability of the City, while the manifest error rule applies to all other aspects of this case, unless we find other reasons mandating a de novo review, as argued by GM. See, e.g., Delphen v. Department of Transportation and Development, 94-1261 (La.App. 4 Cir. 5/24/95), 657 So.2d 328 (misleading jury instructions with respect to a products liability claim require a de novo review of the record with respect to the apportionment of fault). Although we follow the dictates of this circuit, the evidence with regard to the liability of the City was a minor part of the trial; the vast majority of the testimony and exhibits addressed whether Ms. Williams was wearing a seat belt, the liability of GM, and Ms. Williams' injuries and damages. Therefore, we conduct a de novo review only with respect to that portion of the evidence that gave rise to the inconsistent verdicts and apportionment of fault, if necessary.
The first issue addressed is whether Ms. Williams was wearing a seat belt at the time of the accident. GM contends that given the evidence presented, no reasonable person could conclude that Ms. Williams was wearing a seat belt, while Ms. Williams argues that the jury's factual finding was based on competent evidence presented at trial. We review that evidence.
The plaintiffs rely in large part on the testimony of Ms. Williams, who testified that she was wearing her seat belt at the time of the accident. In fact, she maintains that she and Mr. Boutee always wore their seat belts when driving. Ms. Williams' mother and brother corroborated her testimony of habitual seat belt use. On the other hand, GM points out that due to her head injury, Ms. Williams' testimony on this issue is not credible, pointing out verifiable inconsistencies in her recollection of the events preceding the accident.[5]
Pursuant to La. C.E. art. 406, the evidence of the habit of a person, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person on a particular occasion was in conformity with the habit. Therefore, the jury was entitled to find, absent compelling evidence to the contrary, that Ms. Williams was wearing her seat belt at the time of the accident, based on her and her family members' testimony of habitual seat belt use. GM, however, contends that compelling evidence exists in the record before us that requires a finding to the contrary.
First, GM relies on the testimony of witnesses on the scene who stated that Ms. Williams was not belted. Jay Watts, the only eyewitness to the accident, testified that when he looked inside the Cutlass, he saw an unbelted Ms. Williams down near the floor. However, the plaintiffs point out that Mr. Watts gave contradictory statements at different times on this issue. For example, in his deposition eight years before trial, he could not recall if he walked over to the Cutlass to see if the people inside were okay, and in a statement given years earlier to GM, he said that he thought "the lady" was driving. Consequently, the plaintiffs contend that no weight should be given to Mr. Watts' testimony.
Next, GM relies on the testimony of Mr. Kelly, the City's tow truck driver, who testified that he was sure that neither occupant of the Cutlass was wearing a seatbelt. However, Mr. Kelly also testified *540 that he "was out of it for 15 or 20 minutes" immediately after the collision and remained in his truck. Although he agreed with GM's counsel that he did not see any seatbelts in place, on cross-examination he conceded that he did not investigate to see if either person in the Cutlass was actually wearing a seatbelt.
GM also cites the testimony of Remy Moreau, the emergency medical technician responsible for Ms. Williams. He noted in his report that she was sunken down in the seat with her legs under the dash and unrestrained. However, he testified that when he looked inside the vehicle, Ms. Williams still had her buttocks on the seat and that he could not get to Ms. Williams until after the Fire Department had performed an extrication, which would have included removing the seatbelt. Mr. Moreau testified that after the extrication was completed, he did not see a belt on Ms. Williams, but that he did not know if she was wearing a seat belt at the time of the accident.
Officers Audie Jackson and John Dobbart were the first New Orleans Police Department ("NOPD") officers on the scene. Neither officer could remember seeing a seatbelt on Ms. Williams, but they could not testify that she was unbelted. Finally, Officer Marc Ducote, the investigating officer from the NOPD Fatality Unit, did not arrive on the scene until after the ambulances had left and had no knowledge of whether Ms. Williams was belted. In addition, he testified that he did not investigate the issue.
Next, GM contends that post-accident photographs confirm that Ms. Williams was unbelted. The police took some of the photos during its investigation, while others were taken by the plaintiffs' counsel eleven days after the accident while the vehicle was at the NOPD impound lot.[6] Both GM and the plaintiffs presented expert testimony using the photographs to support their respective positions. Therefore, we find that the photographs do not resolve the issue.
In addition, Ms. Williams' medical records are inconclusive on the issue of whether she was belted at the time of the accident. Admittedly, the medical records do not contain any reference to seat belt use or nonuse and no reference to any seatbelt bruising or other often-seen seatbelt related injury exists in these records. However, the plaintiffs presented medical testimony that such bruising is not always seen and/or recorded by hospital personnel, especially in light of the severity of Ms. Williams' injuries.
GM also presented the testimony of seatbelt expert/GM engineer Gerald Cooper who testified that Ms. Williams was not wearing her seat belt. He based his opinion on the medical records and testimony of scene witnesses, as discussed above, as well as photographs that did not show blood on the seatbelts, but revealed damage to the instrument panel and dash, the lack of any evidence of loading on the seatbelt system, Ms. Williams' position in the car after the crash, and the position of the cinching latch plate on the seatbelt.
In addition to Ms. Williams' testimony, the plaintiffs presented that of biomechanical and occupant kinematics expert, Jacqueline Paver, Ph.D., who stated that the *541 injury pattern (horizontal cut above the right ear) is only consistent with Ms. Williams wearing a seatbelt that developed excessive slack on the shoulder portion of the belt before the crash. Mr. Cooper did not dispute that the pattern of injuries suffered by Ms. Williams during the crash could provide a basis for Dr. Paver's conclusions.
Applying the manifest error/clearly wrong standard to this issue, we cannot say and do not find that the jury was manifestly erroneous in finding that Ms. Williams was wearing her seatbelt at the time of the accident. The jury was presented with an abundance of conflicting testimony and demonstrative evidence that could be used to support either side of the issue. When a conflict in the testimony exists, reasonable inferences of fact should not be disturbed upon review, even though the appellate court may believe its own evaluations and inferences are as reasonable. When there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra, 549 So.2d at 843. Therefore, this assignment of error is without merit.
We next consider whether Ms. Williams sustained enhanced injuries as a result of an inadequate warning regarding the GM restraint system. This issue is composed of two parts: (1) whether there was excessive slack in the shoulder harness at the time of the accident and (2) whether the warning by GM was adequate. Obviously, the jury found that excessive slack existed at the time of the collision; this is a factual finding to which we are required to give due deference.
Beginning with 1974 passenger car models, the federal government required that the belt system for the driver position and right passenger position be a three-point belt and an emergency locking retractor in the shoulder belt. Concerned that the driving public would find the shoulder belt uncomfortable and opt to ignore the belt entirely or wear the restraint system improperly, GM developed a restraint system with a "tension reliever" or "comfort feature," which became known as the "window shade."[7] Following GM's lead, Ford, and Chrysler also incorporated the "window shade" device into the cars they manufactured and distributed in the United States. It is estimated that at one time there were 100,000,000 cars being driven in the United States with the comfort feature.
GM presented the testimony of Robert Sinke, who worked at GM for 34 years. During that time, Mr. Sinke supervised crash tests that GM did to research, develop, and validate the crash performance of its vehicles. He also managed GM's Occupant Protection Group, members of which included the experimental and developmental engineers who researched and developed the GM seatbelts. These engineers wrote most of the language GM included in its 1982 Oldsmobile Cutlass Supreme Owner's Manual about seatbelt use, and Mr. Sinke was involved with the inclusion of that language.
Mr. Sinke explained the seatbelt instructions contained in the safety section of the 1982 Cutlass Owner's Manual to the jury. Using both pictures and words, the manual explains how to adjust the belt to put a small amount of slack in the shoulder belt. The instructions state that the least amount of belt webbing should be pulled *542 out of the seatbelt retractor to minimize belt pressure, and described how to reduce excessive slack. The manual also includes a "Caution," stating that shoulder belt slack should be kept to a minimum because too much slack could reduce the amount of protection afforded by the seatbelt.
However, Mr. Sinke conceded that an occupant could inadvertently introduce excessive slack into the shoulder portion of the belt through normal body movements within the vehicle, and that excessive slack would compromise the effectiveness of the restraint system.[8] Despite this knowledge, Mr. Sinke admitted that GM did not put anything in the owner's manual or anywhere else in or on the vehicle to warn seatbelt users that too much slack could be introduced inadvertently. He stated that GM did not feel that "that level of detail... was necessary."
GM relies on the testimony of Ms. Williams herself who stated that she never experienced a problem with slack in the seatbelt. It cites her statements that, on the night in question, the shoulder belt was snug and she did not make any movements that might have introduced excessive slack in the seatbelt. However, GM argued earlier that Ms. Williams' recollection of wearing her seat belt that evening is unreliable due to her head injury. Therefore, it is entirely possible that inadvertent slack was introduced into Ms. Williams' belt before the accident, but that she has no memory of it.
This possibility becomes more likely than not in light of Dr. Paver's testimony, combined with the other expert witnesses presented by the plaintiffs. Dr. Paver testified that the principal direction of force ("PDOF") of a crash is important because an occupant moves along the PDOF during the crash. She testified that the occupant continues moving along that path until he or she interacts with the seat belt, or some other part of the car. If the PDOF is different, then the movement of the occupant will be different. According to Dr. Paver, the PDOF of the instant crash was 30-45 degrees.
Dr. Paver then presented the jury with three different scenarios, utilizing the accident reconstruction prepared by other plaintiffs' experts, the type of seatbelt in the vehicle, and Ms. Williams' diagnosed injuries. The first scenario considered by Dr. Paver, and the one suggested by GM, was that Ms. Williams was not wearing her seat belt at the time of the crash. Dr. Paver explained that considering the Delta-V of the Cutlass and the PDOF of the impact, if unbelted, Ms. Williams' unrestrained body would have continued to move forward and to the right (relative to the vehicle), at an effective speed of thirty-five miles an hour until her face hit the right vertical steel frame of the windshield (known as the "A-pillar").
As a result of such an impact, Dr. Paver opined that Ms. Williams would have incurred vertical injuries to her face, rather than the horizontal cut to the side of her head that she actually suffered. Dr. Paver also stated that Ms. Williams would have also had facial and/or skull fractures, which did not occur.
The second scenario assumed that Ms. Williams was wearing a properly designed belt that had not developed excessive slack prior to the crash. Dr. Paver testified that without excessive slack on the shoulder portion of the belt, Ms. Williams' head would not have traveled far enough to *543 contact the interior of the vehicle, the right window shade, or the right side rear view mirror, with the force necessary to cause the brain injury. Dr. Paver stated that without excessive slack in the shoulder part of the belt, Ms. Williams would have experienced minor head contact and relatively minor injuries, but certainly no brain injury.
The third scenario assumes that Ms. Williams was wearing her seat belt, but that the shoulder portion had developed excessive slack prior to the crash. Ms. Williams' lower body would be restrained to some degree by the lap portion of the belt, preventing her face from coming into contact with the A-pillar during the crash. However, her upper body would bend forward until her chest caught up with the slack in the shoulder belt. Once her chest contacted the slack belt, her head would whip down and to the right (relative to the vehicle), until it impacted the right window shade or the right side rear view mirror with sufficient force to cause brain injury. Dr. Paver testified that the injuries Ms. Williams actually received could only have occurred under the conditions presented in the third scenario.
Under cross-examination, Dr. Paver was questioned about her reliance on GM crash test C5072. Dr. Paver testified on direct that the PDOF of the instant crash was 30-45 degrees. However, GM brought out that crash test C5072 had a PDOF of only 15 degrees. In other words, crash test C5072 was a more frontal crash because it caused the occupant to move further forward and less to the right. GM contends that this important difference was magnified by Dr. Paver's failure to consider the effect that the violent counterclockwise rotation of car had on Ms. Williams' movements during the crash. GM argues that because Dr. Paver's opinions are based on an obviously incorrect foundation, the jury was manifestly erroneous by relying on her testimony.
The weight to be given testimony of experts depends upon their qualifications and the facts on which they base their opinions. A trier of fact may evaluate expert testimony by the same principles as apply to other witnesses; it has great discretion to accept or reject expert or lay opinions. Lopez v. Wal-Mart Stores, Inc., 94-2059 (La.App. 4 Cir. 8/13/97), 700 So.2d 215, writ denied, 97-2522 (La.12/19/97), 706 So.2d 457; also see Schlesinger v. Herzog, 95-1127, 95-1128 (La.App. 4 Cir. 4/03/96), 672 So.2d 701, writ denied, 96-1328 (La.10/04/96), 679 So.2d 1381.
GM had an adequate opportunity to cross-examine Dr. Paver on the alleged inaccuracies of her opinions. In addition, GM had Dr. Paver's report and had previously deposed her. GM made a tactical decision not to call its own biomechanical and occupant kinematics expert, although such experts were listed in GM's pre-trial submissions. Instead, GM relied on its cross-examination of Dr. Paver to discredit her opinions.
As the reviewing court, the issue to be resolved is not whether the trier of fact was wrong but whether the factfinder's conclusions were reasonable. Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073. Moreover, where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is most credible. Id. at p. 5, 666 So.2d at 1077. Applying the manifest error rule, we find that the jury had a reasonable basis on which to find that slack existed in the shoulder belt of the restraint system at *544 the time of the accident.[9]
The next component of this issue focuses our attention to the actual warning that was placed in the GM's owner's manual and whether an additional warning regarding the inadvertent slack was necessary. As discussed above, Mr. Sinke testified that GM was aware that slack could inadvertently be introduced into the shoulder belt of the GM restraint system but felt that a specific warning to the user was not necessary.
Ms. Williams presented the testimony of William H. Muzzy, III as an expert in the field of occupant kinematics, seat belt design and effectiveness, and general mechanical engineering. Mr. Muzzy first testified that based on the pictures taken of the Boutee vehicle, the seat belts in the Cutlass were the original GM belts installed by the manufacturer. He also testified about the window shade feature and described for the jury exactly how it operated, telling them that normal movements in the vehicle could inadvertently introduce slack in the shoulder belt. He also stated that every inch of slack placed in the shoulder harness degraded the effectiveness of the system, a fact not disputed by GM. Mr. Muzzy examined the warnings contained in the Cutlass owner's manual and testified that the occupant was not warned that normal movements could inadvertently set the window shade feature. He also stated that nothing in the car was present to warn of the possibility of inadvertent slack.
It was also Mr. Muzzy's opinion that Ms. Williams was wearing her seat belt at the time of the accident and that slack was present in the shoulder portion of the belt. Mr. Muzzy testified that if the belt had worked properly, a person should not get severely injured in a vehicle if hit at 35 miles per hour Delta-V. Mr. Muzzy also stated that Ms. Williams moved forward and to the right during the crash sequence, and that if unrestrained, she would have gone face up into the A-pillar.
Mr. Muzzy testified that GM had known of the problem of inadvertent slack for at least ten years and had done nothing to correct the problem until the seat belts were replaced years later. He opined that GM could have easily warned the occupants of the vehicles by placing a warning on the sun visor, but did not do so.
Finally, Mr. Muzzy was questioned about alternative designs in lieu of the window shade feature. His opinion was that seat belt systems using the window shade feature were defective. However, he admitted that approximately 100,000,000 cars and trucks were on the road with that feature at one time.
The Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51, et seq., became effective on 1 September 1988. Pursuant to § 2800.54, the manufacturer of a product is liable to a claimant for damage proximately caused by a characteristic of the product which renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or other person or entity. Pursuant to § 2800.57:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed *545 a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristics and its danger to users and handlers of the product.
B. A manufacturer is required to provide an adequate warning about its product when:
(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
A central element of a plaintiff's cause of action for failure to adequately warn of a product's danger is that there must be some reasonable connection between the omission by the manufacturer and the damage, which the plaintiff has suffered. Ballam v. Seibels Bruce Insurance Co., 97-1444, p. 13 (La.App. 4 Cir. 4/1/98), 712 So.2d 543, 550, writ denied, 98-1168 (La.6/19/98), 720 So.2d 1213. Although a product is not defective, a manufacturer still has the duty to instruct reasonably foreseeable users of its product with regard to its safe use. Delery v. Prudential Insurance Co. of America, 94-0352 (La.App. 4 Cir. 9/29/94), 643 So.2d 807, writ denied, 94-2666 (La.12/16/94), 648 So.2d 393.
Pursuant to La. R.S. 9:2800.53(7), "reasonably anticipated use" means a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances. In addition, subsection (9) provides that an "adequate warning" is one that would lead an ordinary reasonable user of a product to contemplate the danger in using the product and either to decline to use the product or, if possible, to use it in such a manner as to avoid the damage for which the claim is made.
GM first argues that the plaintiffs did not introduce proof that additional warnings would have made any difference in this crash. This argument is connected to the alleged improper jury instruction, which GM contends was given by the trial court: GM contends that the jury was improperly charged using pre-LPLA law with an instruction that when the plaintiff proves that a warning is inadequate, there is a presumption that an adequate warning would not have been read and heeded.[10] However, this circuit still applies the presumption post-LPLA. For example, in Grayson v. State ex rel. Department of Health and Hospitals, XXXX-XXXX (La.App. 4 Cir. 12/30/02), 837 So.2d 87, the presumption was applied. See also, Ballam, 712 So.2d 543, wherein this court applied the presumption. Consequently, the jury *546 was properly instructed to apply the presumption.
With the presumption, the jury was able to find that proper warnings would have been heeded by Ms. Williams. Admittedly, Ms. Williams' closed head injury renders direct proof impossible. However, the jury is entitled to consider all the circumstantial evidence when making its factual findings.
GM also argues that wearing a seat belt with excessive slack is not a "reasonable anticipated use." However, the testimony establishes that GM knew that slack could be introduced inadvertently into the seat belt through normal movements inside the vehicle. This is a danger against which GM chose not to warn. Further, one cannot reasonably anticipate that an occupant in a vehicle will read the owner's manual. Therefore, as testified to by Mr. Muzzy, and obviously accepted by the jury, a warning against the inadvertent introduction of excessive slack should have been visible to Ms. Williams as a passenger in the Boutee vehicle. Because inadvertent slack could be introduced into the restraint system, such was an anticipated use of the product falling within the LPLA. Therefore, this assignment of error is without merit.
GM's next assignment of error concerns the other instances in which it contends that the jury was improperly charged by trial court. We discuss the four jury charges of which GM complains.
The trial court charged the jury that GM had the burden of proving that the comfort feature on Ms. Williams' seat belt was in the same condition on the night of the accident as it was when it left GM approximately ten years earlier. Although this charge is incorrect, we find that the plaintiffs introduced sufficient evidence to support the finding that the comfort feature was unchanged.
First, Mr. Muzzy testified that in his opinion from viewing the photographs in evidence that the 1982 Cutlass was equipped with original GM seat belts. He also testified that there were no replacement belts on the market that would fit the vehicle in question. Second, the jury could rely on the testimony of Dr. Paver to find that there was a functioning comfort feature in the vehicle on the night of the accident. Therefore, although the jury was improperly charged regarding the burden of proof, we find that the evidence introduced by the plaintiff proved a crucial element of her case. Consequently, the error was harmless.
Next, the trial court charged the jury that GM had the burden to prove that the slack was unreasonably excessive. Although incorrect, the error was harmless, because the plaintiffs carried their burden of proof through the testimony of Mr. Muzzy and Dr. Paver.
Next, GM contends that the jury was improperly charged as follows:
Louisiana law imposes a duty on a manufacturer to warn the user of any dangerous propensities which may foreseeably accompany any normal use of the product.
The LPLA uses a standard of "reasonably anticipated use," a standard that is more restrictive than the pre-LPLA standard of "normal use," which included all reasonably foreseeable uses and misuse. Delphen, supra, 94-1261 at p. 5, 657 So.2d at 333. The inclusion of the phrase "reasonably anticipated use" in the LPLA conveys the message that the manufacturer is not responsible for accounting for every conceivable foreseeable use of a product. The more restrictive scope of liability was meant to avoid prior confusion because *547 virtually any conceivable use is foreseeable. Id. at. pp. 5-6, 657 So.2d at 333.
Again, this error was harmless. The evidence indicates that Ms. Williams placed the seat belt on herself snug and without slack. The evidence in the record indicates that the belt developed slack inadvertently on its own and without Ms. Williams' awareness. Thus, Ms. Williams' use of the belt was reasonably anticipated. In addition, the jury was instructed on comparative fault related to misuse of the belt and specifically found that Ms. Williams did not misuse the belt because it did not assign her with any comparative fault. Therefore, although the jury was improperly charged, based on the evidence in the record, the error was harmless.
Finally, GM contends that the jury was improperly charged that warnings must be expressed with an intensity that is proportionate with the risk. Pursuant to La. R.S. 9:2800.53(9), an adequate warning is one that leads an ordinary reasonable person to contemplate the danger in using a product or to use the product in such a manner as to avoid the danger for which the claim is made. In addition, GM contends that under La. R.S. 9:2800.57, it is required to "use reasonable care to provide an adequate warning." Again, we fail to see how GM was prejudiced by this charge. First, it is obvious that a warning must be expressed in a manner that is proportionate with the risk. In addition, no dispute exists but that GM did not provide any warning about the introduction of inadvertent slack; therefore, the warning could not be "adequate." Therefore, any error is harmless.
We find this assignment of error to be without merit.
GM's next assignment of error involves what it alleges to be two improper evidentiary rulings by the trial court. First it contends that the trial court permitted the plaintiffs to introduce evidence that contained inflammatory and irrelevant notes about seat belts unrelated to the issues in this case, and second, that the trial court permitted GM to introduce exhibit GM-27 without objection, allowed questioning about the exhibit for the jury, and then ruled that the already-omitted exhibit was inadmissible and excluded it.
During the testimony of Mr. Sinke, the trial court allowed the plaintiffs to question him about hand-written notes made by a GM executive, Tom Terry, regarding comments made by other GM employees during a 1982 meeting.[11] GM objected to the admission of the statement arguing that pursuant to La. C.E. arts. 401-03, the evidence was not relevant because it did not concern the seat belt system at issue herein, and that any minimal probative value was substantially outweighed by the danger of undue prejudice, confusion of the issues, and misleading of the jury.
In response, the plaintiffs contend that the reference to GM spending additional money on seat belts is relevant to the comfort feature found in the seat belt at issue. In addition, the plaintiffs argue that because the trial court permitted Mr. Sinke an unfettered time under cross-examination to explain why the comments were not applicable, the ruling was within the trial court's discretion. Finally, GM had advance notice of this line of questioning and could have taken steps to exclude the matter pre-trial.
A trial court is afforded great discretion concerning the admission of evidence *548 at trial, and its decision to admit or exclude evidence may not reversed on appeal in the absence of an abuse of that discretion. Miller v. Southern Baptist Hospital, XXXX-XXXX, p. 5 (La.App. 4 Cir. 11/21/01), 806 So.2d 10, 15, writ denied, XXXX-XXXX (La.3/28/02), 811 So.2d 943.
In reviewing the testimony, we do not find that the trial court abused its vast discretion by admitting the evidence in question. While it was only tangentially relevant to the seat belt, Mr. Sinke was given sufficient time to explain to the jury why GM comments were inapplicable. Consequently, we find no error in the admission.
GM also argues that trial court improperly excluded GM-27 after it had been admitted without objection. GM-27 is a Memorandum Supporting the GM Technical Committee (GTC) Advice of Action regarding shoulder belt tension relief (comfort features). The GTC was the highest level technical committee at GM that was involved in product-related decisions for GM cars. GM contends that it used this exhibit without objection during the cross-examination of expert Mr. Muzzy, and then introduced GM-27 into evidence without objection. Later, after the document was already in evidence, GM tried to use it again with its own witness. At that time the plaintiffs objected and the trial court withdrew the exhibit from evidence. GM objected to the trial court's ruling and proffered the exhibit.[12]
In response, the plaintiffs argue that while GM attempted to use GM-27 during it cross-examination of Mr. Muzzy, he testified that he had no specific recollection of ever seeing the document. Later that day, the plaintiffs state that GM's counsel innocuously offered and introduced the document in a long series of exhibits used during the course of the day. The next morning, before the jury was brought in, the plaintiffs' counsel advised the court of the objection to GM-27. At that point, the trial court heard testimony from Mr. Sinke, the GM representative, concerning the document wherein he stated that he was familiar with all the contents of the document and could testify as to the information contained therein. At that time, the trial court found the exhibit inadmissible. Because the contents of the document were available through the testimony of Mr. Sinke, we find that the trial court did not abuse its vast discretion in excluding GM-27. Accordingly, this assignment of error is without merit.
GM's next assignment of error concerns its motion for mistrial, which was denied by the trial court. During the cross-examination of Mr. Sinke, the plaintiffs' counsel questioned him about another lawsuit in which GM argued that the plaintiff in that unrelated lawsuit was not belted. The exchange was as follows:
Q. [By the plaintiffs' counsel, Mr. Salas] The last case, one of the last cases which you testified in connection with that window shade device allegation in the law suit was just last year?
A. [Mr. Sinke] I believe there may have been more than one case last year in which I testified, might have been two, in which there was a comfort feature allegation.
Q. O.K. One of those cases was the Tucker v. General Motor's case?
A. Yes, that sounds familiar.

*549 Q. That was in Pennsylvania, I believe?
A. I can't remember the venue. I remember the name, but I can't remember the venue.
Q. And in that case, just as in this case, another expert on behalf of General Motors was Mr. Cooper who testified here yesterday, right?
A. I can't remember who else was in that case. I couldn't substantiate that from memory.
Q. Do you remember that one of that (sic) General Motors defense, or one of the defenses in that case was just as it is in this case, that the injured person, Mr. Tucker, was not wearing his seat belt?
A. I can recall, yes.
Q. You can recall also that the jury did not agree with you or Mr. Cooper the
Mr. Cassisa [defense counsel]: Excuse me, Judge, I want to move for a mistrial.
The Court: I sustain [sic] your objection.
Mr. Cassisa: May I make a record?
The Court: The jury will please disregard that unfortunate comment.
Later, outside the presence of the jury, counsel for GM reurged the motion for mistrial, arguing that the questions were improper and highly prejudicial. The trial court stated:
I'm very upset, but I certainly won't declare a mistrial. The costs are going to go with the judgment, but I just don't know what to do about sanctions. I'll think about it.
The Louisiana Code of Civil Procedure does not expressly provide for mistrials, and the jurisprudence concerning motions for mistrials is limited. Generally, mistrials are properly granted because of some fundamental failure in the proceeding. Lewis v. Time Saver Stores, Inc., 599 So.2d 442, 443-44 (La.App. 4 Cir.1992)(citing 76 Am.Jur.2d, Trial § 1073). It is well established in all law that a motion for a mistrial in a civil case should be granted under the following circumstances: (1) when the trial judge determines that it is impossible to reach a proper judgment because of some error or irregularity; and (2) where no other remedy would provide relief to the moving party. Estate of Cristadoro ex rel. Jones v. Gold-Kist, Inc., XXXX-XXXX, pp. 24-25 (La. App. 4 Cir. 1/23/02), 819 So.2d 1034, 1049, writ denied, XXXX-XXXX (La.9/13/02), 824 So.2d 1171. Motions for mistrial should also be granted upon proof of prejudicial misconduct occurring during a jury trial which cannot be cured by admonition or instructions to the jury. Id. A trial court is granted great and vast discretion in determining whether to grant a mistrial, since mistrials are not a matter of right. Id. The conduct of the trial is within the discretion of the trial court, and that discretion is subject to review only for abuse of that discretion. Id. at. p. 25, 819 So.2d. at 1049; Barre v. Bonds, 99-1806, p. 23 (La.App. 4 Cir. 5/10/00), 763 So.2d 60, 70 citing La. C.C.P. art. 1631. Generally, courts have accepted that a mistrial is a dramatic and drastic remedy; therefore, if no other remedy is available for the factfinder to consider in reaching an appropriate verdict, then a mistrial would be proper. Estate of Cristadoro, XXXX-XXXX at p. 25, 819 So.2d at 1049.
In the instant case, the trial court cautioned the jury to ignore the remarks by the plaintiffs' counsel. In addition, as noted by the trial court at the hearing on GM's motion for judgment notwithstanding the verdict, the trial court took into consideration the length of the trial in making its determination to deny *550 the motion for mistrial. Because we find ample evidence in the record to support the jury's factual determinations in this case, we hold that the trial court did not abuse its vast discretion in denying the motion. Accordingly, this assignment of error is without merit.
GM's next assignment of error concerns the jury's award of $1,000,000.00 in future medical expenses. GM contends that the award is not supported by any evidence in the record.
The plaintiffs presented the testimony of Dr. Cornelius Gorman, an expert in life care planning. He testified extensively concerning the categories and costs of Ms. Williams' future medical and life care needs. The present value of all items in the plan at the mid-point range was $2,299,989.65.[13] GM argues that the most the jury could have possibly awarded for future medical expenses was $595,448.26 (total of medical services, medications, med-surgical needs, therapy, counseling, and medical equipment listed in Exhibit P-202, upper limit of present value).
After reviewing all the evidence we do not find that the jury was clearly wrong in awarding Ms. Williams $1,000,000.00 for future medical expenses. Dr. Gorman testified extensively concerning the categories and costs of Ms. Williams' future medical needs. In addition to the items listed above, Dr. Gorman also included items for housing, attendant and/or household assistance, and transportation. Based on the totality of Dr. Gorman's testimony, the jury could reasonably conclude that certain items under the categories of housing, attendant and/or household assistance, and transportation were medically related and necessary. For example, certain housing requirements as identified by Dr. Gorman relate to medical aspects of Ms. Williams' condition. In addition, while household assistance is necessary to aid Ms. Williams in her day-to-day activities, additional care will be necessary to meet her medical needs; the testimony established that her mother, who has been providing such care in the past, might not be do able to do so in the future due to her own medical concerns and advancing age. Finally, some of Ms. Williams' transportation costs will not only provide her with activities outside of the home, but will also transport her to and from physical and occupational therapy as well as counseling. Consequently, we do not find that the jury was clearly wrong in its award. This assignment of error is without merit.
Lastly, we address GM's assignment of error that the trial court committed legal error when it added damages by an amended judgment after the order for suspensive appeal had been filed.[14] A review of the record reveals the following events.
On 16 July 2002, the trial court gave notice of signing of the judgment. On 23 July 2002, both GM and the plaintiffs filed various post-trial motions including motion for JNOV, new trial, additur, and amendment of judgment to include past medical damages. On 21 August 2002, the trial court held a hearing on all post-trial motions. During that hearing the parties agreed to the addition of past medical expenses, which the court anticipated *551 would be done in the near future since the parties had not determined the exact amount. In all other respects, the post-trial motions were denied as reflected in the hearing transcript of 21 August 2002. A judgment was signed by the trial court the next day.
On 11 September 2002, GM filed a motion for a suspensive appeal. The trial court signed an order granting the suspensive appeal on 12 September 2002. On 10 October 2002, the plaintiffs filed a motion to amend the earlier judgment to correct an error of calculation to add the amount of past medical expenses; the trial court amended the judgment by signing by a new judgment on 18 October 2002, correcting the earlier judgment. Thereafter, on 14 November 2002, GM filed an amended motion for a suspensive appeal. The trial court signed an order granting the motion on 15 November 2002.
GM contends that the trial court did not have jurisdiction to sign the 18 October 2002 judgment because it was divested of jurisdiction as of 11 September 2002 when the motion and order for suspensive were filed and signed. In response, the plaintiffs argue that the judgment was duly amended by the consent of counsel because an agreement to amend was reached in this case. See LaBove v. Theriot, 597 So.2d 1007, 1010 (La.1992). GM, however, maintains that there was no such agreement.
We have reviewed the testimony taken on 21 August 2002 at the hearing on the parties' post-trial motions, and find the following exchange:
Ms. Braun: Judge, can I address one thing because it was raised in this big motion, the JNOV, and that was with respect to past medicals?
The Court: Yes.
Ms. Braun: of the past medical records are in evidence. They went in en globo.
The Court: And the bills, too.
Ms. Braun: And the bills. It's all in evidence. They've been provided in advance, what wasn't put in evidence, what wasn't provided in advance was our calculator tape because I didn't think that was appropriate evidence. But that was provided to show how we got to the total. But the physical bills themselves are in evidence as part ofand I don't have the exhibit number, but whatever the en globo exhibit number is that relates to the medical records.
The Court: How is that relative [sic] to the interrogatories? What was the question?
Ms. Braun: It's relevant, Your Honor, because there was a specific agreement that was reached. If you recall, the interrogatory form originally had a line for past medicals and at the very last minute we took that line out because Your Honor agreed that whatever the total was, that's what it was. The bills were in evidence.
The Court: I would add it.
Ms. Braun: You would add it. And we specifically asked that the interrogatory form be redone to take that line out.
The Court: Write we [sic] a note because I didn't do that.
Ms. Braun: And Mr. Griffin will remember that, I'm sure.
Mr. Griffin: Yes. And the problem is that the tape that they're doing they didn'tThere's two different sets of numbersyou're familiar with itthat is, what Touro charged and what Touro was paid. And the Plaintiff is not entitled to wind fall for what was not paid.

*552 * * *
Mr. Salas: Judge, the amount of money we submitted right now is $314,446. There was a lien that was stipulated.
The Court: Can we stipulate that if there is, in fact an errorI think that counsel is right. She should only get what she actually paid. And if there's an error, do we agree we can treat it as a clerical error.
Mr. Salas: Come back later.
Mr. Griffin: Yes. And that was our problem, was the inability to either verify what they had. The Charity lien was stipulated at fifty-four thousand some odd dollars.
The Court: Is that inclusive? Is that an addition?
Mr. Griffin: Inclusive.
Ms. Braun: Of that number. But, Your Honor, we want to make sure we preserve for the record that we don't agree with the judge's ruling that she is only entitled to what she paid. We believe under the collateral source rule she's entitled to recover the full amount of the medical charges that were incurred.
* * *
Mr. Griffin: Judge, for purposes of appeal, I guess I'd like it to be a final final judgment. If we can get that resolved
Mr. Silas: We're going to meet after this, Judge. We're going to go on and solve this thing.
It is clear from the colloquy that the parties anticipated that the trial court would render an amended judgment to add past medical expenses. Accordingly, we find that the judgment of 18 October 2002 was appropriate and that the trial court had jurisdiction to render that judgment.
In the alternative, GM contends that the trial court erred in awarding the plaintiffs the full amount of the past medical expenses. GM does not dispute the Charity Hospital lien of $54,778.10 and the Medicare lien of $13,407.90. However, GM challenges the Touro Infirmary bill of $220,829.61, in that only $88,450.87 was actually paid. GM contends that only the amounts that were actually paid after the Medicaid discounts are recoverable and that the collateral source rule does not apply under those circumstances.
Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of money received by the plaintiff from sources independent of the tortfeaser's procuration or contribution. Louisiana Department of Transportation and Development v. Kansas City Southern Railway Co., Inc., 2002-2349 (La.5/20/03), 846 So.2d 734. Under this well-established doctrine, the payments received from the independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer. Id. As stated by the Supreme Court in that case:
We recognize that the collateral source rule is most commonly applied to insurance proceeds. Under this general rule, a tortfeaser's liability to an injured plaintiff should be the same, regardless of whether or not that plaintiff had the foresight to obtain insurance. However, our courts have applied the doctrine to a range of situations where the collateral source is provided to the plaintiff by a government agency or even a gratuitous source.
For example, a tortfeaser's liability may not be reduced by the amount of a victim's expenses paid by Medicare. *553 Id. at p. 9, 846 So.2d at 740 (citations omitted; emphasis added).
However, the situation at bar concerns not what was paid by Medicare, but what was discounted by Medicare, an amount for which the plaintiffs were never liable. Once again, a split in the circuits exists as to how to handle contractual write-offs made in conjunction with payments from an insurer to a participating provider who has contractually agreed to the write-offs and to accept the payments in full satisfaction of the debt for medical services rendered.
The third and the fifth circuits have held the collateral source rule applicable to Medicaid/Medicare write-offs, respectively, and allowed the plaintiff to recover the full amount of the charges for services rendered. In Brannon v. Shelter Mutual Insurance Company, 520 So.2d 984 (La.App. 3 Cir.1987), the third circuit held that the collateral source rule was applicable and allowed a tort victim to recover the write-offs based on its finding that the plaintiff retained a natural obligation to pay the hospital (provider) the full amount of the bill for services provided. In Kozina v. Zeagler, 94-413 (La.App. 5 Cir. 11/29/94), 646 So.2d 1217, the fifth circuit also allowed a plaintiff to recover the write-offs from Medicare payments; however, this ruling was based on a compromise settlement in which the tortfeasor defendant agreed to pay its victim the full amount of medical bills, specifically including the difference between the total medicals billed and the amount paid by Medicare.
On the other hand, the second circuit and this circuit have held the collateral source rule inapplicable and the amounts written-off by a provider pursuant to the Medicaid/Medicare programs, respectively, are not recoverable by the plaintiffs/tort victims. In Terrell v. Nanda, 33,242 (La. App. 2 Cir. 5/10/00), 759 So.2d 1026, the second circuit concluded that the collateral source rule does not allow recovery of expenses in excess of Medicaid payments. The court's decision was based on its finding that the plaintiff had no liability to the provider for expenses above those paid by Medicaid; thus no natural obligation existed, and if allowed to recover all of the claimed expenses, the plaintiff would receive a windfall. In Suhor v. Lagasse, XXXX-XXXX (La.App. 4 Cir. 9/13/00), 770 So.2d 422, this court followed the reasoning of Terrell, agreeing that the amounts written off by a Medicare provider do not fall under the collateral source rule for the same reason that they do not give rise to a natural obligationbecause the healthcare provider is obligated by law to accept the Medicare payment as full payment for the patient's expenses, and is prohibited from seeking further payment from the patient.
We are bound to follow this court's reasoning in Suhor, and, therefore, hold that the trial court erred in awarding the plaintiffs the full amount of the Touro Infirmary bill. Thus, we amend the judgment to provide that the plaintiffs shall recover only the amount actually paid by Medicare, $88,450.87.
We now turn to the assignments of error specified by the plaintiffs. First, the plaintiffs contend that the jury erred in failing to find that the GM belt system was unreasonably dangerous in design.
Pursuant La. R.S. 9:2800.56, a product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the plaintiff's damage; and
(2) The likelihood that the product's design would cause the claimant's damage *554 and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating a likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.
While the plaintiffs put forward testimony that alternative designs for the restraint system were available, the record reveals that the comfort feature was widely used in the seat belts of approximately 100,000,000 vehicles produced over a decade, including practically every Chevrolet, Oldsmobile, Buick, Pontiac, Cadillac, GMC, Ford, Lincoln, Mercury, Dodge, Plymouth, and Chrysler. Mr. Sinke explained that GM used the comfort feature to encourage people to wear seat belts before mandatory seat belt use laws were widespread. In addition, Mr. Cooper testified that seat belts incorporating the comfort feature were not unreasonably dangerous in design.
The plaintiffs relied on the testimony of Mr. Muzzy, who testified that he found the seat belt to be unreasonably dangerous in design. However, Mr. Muzzy admitted under cross-examination that there are few seat belts that he believed were safe. The jury evaluated the conflicting testimony from Messrs. Sinke, Cooper, and Muzzy in rendering its factual determination, and we do not find that its decision was manifestly erroneous.
Next, the plaintiffs contend that the general damage award of $2,000,000.00 was abusively low and should be raised to $6,000,000.00. Conversely, GM maintains that the award was not an abuse of the jury's vast discretion.
We begin with La. C.C. art. 2324.1 which states:
In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.
Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of discretion. Williams v. City of Baton Rouge, 98-1981, 98-2024 (La.4/13/99), 731 So.2d 240. The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages; in effect, the award must be so high or so low in proportion to the injury that it shocks the conscience. Blair v. Imperial Inn, Inc., 95-0377 (La. App. 4 Cir. 9/28/95), 662 So.2d 150. Before the court of appeal can disturb an award made by a factfinder, the record must clearly reveal that the trier of fact abused its discretion making its award, and only after making the finding that the record supports that the trial court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point which is reasonably within the discretion afforded that court. Wainwright v. Fontenot, XXXX-XXXX (La.10/17/00), 774 So.2d 70. In order to determine the highest or lowest point of an award within the trier of fact's discretion, the appellate court may refer to prior awards in similar cases. Andrus v. State Farm Mutual Automobile Insurance Co., 95-0801 (La.3/22/96), 670 So.2d 1206.
We have reviewed the jurisprudence for similar injuries for guidance on the range on general damages applicable herein. For example, in Pitre v. Louisiana Tech University, 26,388 (La.App. 2 Cir. 5/10/95), 655 So.2d 659, reversed on merits, 95-1466 (La.5/10/96), 673 So.2d 585, a university *555 student paralyzed in a snow boarding accident on campus was awarded $2,500,000.00 in general damages. In Holt v. State through the Department of Transportation and Development, 28,183 (La.App. 2 Cir. 4/3/96), 671 So.2d 1164, writs denied, 96-1074, 96-1132 (La.6/21/96), 675 So.2d 1080, 1093, a high school junior was awarded $3,000,000.00 in general damages after a car accident, which fractured her skull and left her in a comma for seven months. As a result of the head injury, the plaintiff could no longer speak and was rendered a quadriplegic. In Akerman v. Dawes, 94-0757 (La.App. 4 Cir. 1/19/95), 658 So.2d 1270, this court found an award of $1,500,000.00 in general damages to a woman who fell from a second floor porch, suffering numerous broken bones and a closed head injury which destroyed her vigorous lifestyle, was not abusively low. In DeRosier v. South Louisiana Contractors, 583 So.2d 531 (La.App. 3 Cir.), writ denied, 587 So.2d 700 (La.1991), general damages in the amount of $2,000,000.00 was awarded to an eighteen-year old driver injured in a vehicle accident in which he suffered a permanent brain injury thereafter functioning at borderline mentally retarded intelligence range, suffering from periods of agitated depression and having an estimated fifty to sixty percent anatomical impairment over the entire body. Finally, in Grayson v. R.B. Ammon & Associates, Inc., 99-2597 (La.App. 1 Cir. 11/3/00), 778 So.2d 1, writ denied, XXXX-XXXX (La.1/26/01), 782 So.2d 1027, the plaintiff was awarded $500,000.00 in general damages after being struck in the head by a falling piece of iron weighing as much as three hundred pounds. As a result of the accident, the plaintiff had pronounced weakness on the left side, lost his fine motor skills in the left hand and experienced emotional problems and cognitive deficiencies, specifically visual memories deficits and attention and concentration problems.
While the $2,000,000.00 in general damages awarded to Ms. Williams is, in our opinion, on the low side, we cannot say that the jury abused its much discretion in its award. Consequently, the damage award is within the permissible range of general damages. We find this assignment of error to be without merit.
Finally, we perform a de novo review on the issue of the City's responsibility for the accident in question. As discussed initially in this opinion, the trial court found the City not to be at fault while the jury assessed the City with 40% liability. In rendering its decision, the trial court stated:
I am convinced that the sole cause of the accident itself was the fault of Mr. Warres Boutte in running a red light without lights.
I was particularly impressed by the testimony of Mr. Jay Watts, the only independent witness. While he was somewhat inconsistent in in-material details, he was insistent that Mr. Boutte was proceeding without lights and entered the intersection on a red light.
The uncontradicted testimony reveals that Mr. Boutte was traveling north-bound on Elysian Fields while Mr. Kelly was traveling west on Gentilly in the middle lane immediately prior to the collision. Mr. Watts was traveling in the opposite direction to Mr. Kelly on Gentilly towards eastern New Orleans. The angle of the intersection at Elysian Fields and Gentilly Boulevard from the direction in which Mr. Watts traveling was approximately thirty degrees. Conversely, the angle of the intersection of Elysian Fields and Gentilly from the direction in which Mr. Kelly was traveling was approximately sixty degrees. This intersection was well illuminated with artificial lighting.
*556 Mr. Watts testified that as he approached the intersection of Gentilly Boulevard and Elysian Fields Avenue, he applied his brakes as the light facing him was red. He further testified that immediately before he reached the intersection the light turned green, and as he started to proceed he saw Mr. Boutte's vehicle come across his lane of travel. Mr. Watts testified that the Boutte vehicle did not have its headlights on.
Mr. Kelly testified that he was a half block from Elysian Fields Avenue, when he observed the color of the traffic light controlling his lane of travel. He further testified that he entered the intersection on a green light and was traveling approximately twenty to twenty-five mile an hour when he collided with the Boutte vehicle. Mr. Kelly testified that just before he entered the intersection of Gentilly as it crossed Elysian Fields, he was looking forward. While he admitted that he did not see the Cutlass prior to the impact, he agreed that there was nothing to prevent him from seeing the intersection from where he was sitting in his tow truck. The collision occurred after he had crossed the first lane of traffic of Elysian Fields Avenue. Under cross-examination he agreed that the Cutlass had traveled a longer distance than he inside the intersection prior to the collision.
La. R.S. 32:301 provides that every vehicle shall display lighted lamps and illuminating devices at any time between sunset and sunrise. In addition, La. R.S. 32:232(3)(a) provides that vehicular traffic facing a "steady circular red signal alone" shall stop at a clearly marked stop light, or if none, then before entering the crosswalk on the near side of the intersection. However, Section 232(1)(a) also states:
Vehicular traffic facing a circular green signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic, including vehicles turning right or left shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection or any adjacent crosswalk at the time such signal is exhibited.
In Coleman v. Riley, XXXX-XXXX (La. App. 4 Cir. 2/7/01), 780 So.2d 1071, we held that a favored driver can still be found contributorily negligent if his or her substandard conduct contributed to the cause of the accident. Id. at p. 4, 780 So.2d at 1074, (citing Thomasie v. Lee, 97-397, p. 7-8 (La.App. 5 Cir. 9/30/97), 700 So.2d 580, 583-84). Moreover, "[i]f a motorist fail to see what he should have seen, then the law charges him with having seen what he should have seen, and the court examines his subsequent conduct on the premises that he did see what he should have seen." Id. (citing Fernandez v. General Motors Corp., 491 So.2d 633, 636-37 (La.1986)).
Performing a de novo review, we find that Mr. Kelly bears some fault in connection with this accident. Mr. Watts was able to see the Boutee vehicle in time to avoid the collision. Mr. Kelly had a better view of the intersection and should have seen the Boutee vehicle even without its headlights. However, we also find that Mr. Boutte, driving a dark blue vehicle without his headlights, bears the majority of fault. However, in reapportioning fault we must also consider GM's liability for Ms. Williams' enhanced injuries.
In Mistich, supra, 95-0939, 666 So.2d 1073, the decedent was a passenger in a Volkswagen automobile that was rear ended by a pick-up truck. The decedent was ejected from her front passenger seat, went through the rear glass and struck her head on the grill of the pick-up truck. She died approximately two months later. The trial court determined that the decedent's *557 seat was defective, which finding was reversed by the court of appeal. Upon review the Supreme Court agreed with the trial court and found that the decedent was killed as a result of both the negligent operation of the pick-up truck driver and the defective Volkswagen seat. The Supreme Court stated:
Undoubtedly, Thibodeaux's negligence set the course of the accident, but decedent's death was a direct result of the impact sustained when her head collided with the front portion of the pick-up truck because her seat disengaged from the floor which caused her to be thrown to the rear of the Volkswagen. Based on this conclusion, this court assigns 50% of fault to Thibodeaux with the remaining 50% to Volkswagen.
Id. at p. 11, 666 So.2d at 1081.
In the instant case, the negligence of Messrs. Boutte and Kelly combined to set the course of the accident, but we find that Ms. Williams' injuries are the direct result of the impact sustained when her head collided with the inside of the vehicle because of the inadvertent slack in her seat belt. Therefore, we assign thirty percent of the fault to Mr. Boutte, twenty percent of the fault to the City of New Orleans, and fifty percent of the fault to GM.[15]
Based on the foregoing, we affirm in part, reverse in part, and amend the judgment of 18 October 2002, as reflected above. Each party is to pay its own costs on this appeal.
Finally we address the appeal in number 2003-CA-0436, wherein plaintiffs, Giselle M. Boutee, individually and on behalf of Jasmine R. Boutee, and defendants, Brian Kelly, the City, and the NOPD, stipulated, on the issue of damages only, in the amount of $200,000.00 in favor of the plaintiffs therein and against the defendants. It was agreed that the Boutee plaintiffs would recover damages from the City should it be found liable on appeal. Accordingly, since we have assigned the City with twenty percent of fault in causing the accident, judgment in favor of the Boutees in the amount of $40,000.00 together with judicial interest from the date of judicial demand, and all costs of their proceedings, is assessed against the City.
AFFIRMED IN PART; REVERSED IN PART; AMENDED; JUDGMENT RENDERED.
NOTES
[1] For purposes of this opinion, the term "plaintiffs" refers to Ms. Williams and her
[2] In a bifurcated trial such as the one before the court, the question of fault of the public body is put to the jury although, in actuality, the jury is not determining the public body's fault.
[3] The jury awarded Ms. Williams $2,000,000.00 in general damages, $500,000.00 for lost wages and diminished earning capacity, $1,000,000.00 for future medical expenses, and $1,300,000.00 for "cost of life care plan."
[4] On 18 October 2002, after GM had filed its suspensive appeal, the trial court granted the plaintiffs' motion to amend the judgment to include awards for past medical expenses. The timing of this order and the amounts of the medical expenses awarded are errors assigned by GM and will be discussed infra.
[5] For example, Ms. Williams is unable to account for at least an hour of time before the accident, she over-estimated the speed of the Boutee vehicle, and she claims they were turning at the time of the accident, which was disproved by experts for both sides.
[6] While the plaintiffs' counsel signed a document in which he agreed to "no altering or tampering with the vehicle shall be permitted," he admitted at trial that he altered the position of Ms. Williams' seatbelt and other items in the car. It was revealed at trial that despite efforts to the contrary, the police released the vehicle to Mr. Boutee's relatives and the vehicle was destroyed. Therefore, none of the experts were ever able to examine the Cutlass or the seatbelts.
[7] The comfort feature became known as the "window shade" because it operated much like an old-fashioned window shade; after buckling up, one would pull it out a little bit from the chest, let it go back a little, and it set in place.
[8] These motions include reaching for the radio or other object in the car, or turning in the seat to speak to another occupant.
[9] As noted by the trial court in its judgment denying GM's motion for judgment notwithstanding the verdict, Dr. Paver concluded that Ms. Williams was wearing a seat belt based on the damage to the interior of the vehicle and the side mirror and the injuries suffered and not suffered by Ms. Williams. Although the jury was presented with contrary opinions, the jury sided with Dr. Paver.
[10] See Bloxom v. Bloxom, 512 So.2d 839, 850 (La.1987).
[11] The notes included statements that GM's seat belts are the best in the industry "but we have some bad ones;" that GM's divisions were not interested in better seat belts and not interested in spending money; and "we will pay for our decision in court eventually."
[12] It is well settled that a party who contends his evidence was improperly excluded is required to make a proffer of the evidence, and if he fails to do so, he cannot contend such an exclusion was erroneous. Lee v. Lee, 98-0031, p. 5 n. 5 (La.App. 1 Cir. 12/28/98), 727 So.2d 622, 625 n. 5.
[13] Apparently the jury rounded up to $2,300,000.00 and then split that amount between future medicals of $1,000,000.00 and a life care plan of $1,300,000.00.
[14] GM's last assignment of error concerns the judgment that cast GM as liable for fifty percent of Ms. Williams' recoverable damages, when the jury found it only responsible for twenty percent of the fault. We address this argument infra after conducting a de novo review of the inconsistent verdicts by the trial court and the jury regarding the City's liability.
[15] Because we assign fifty percent of the fault to GM, we do not address its assignment of error concerning the judgment casting it liable for fifty percent of the damages.