PATRICIA RIVET MURRAY, Judge.
 

 | defendant, Lafayette Insurance Company [“Lafayette”], appeals the trial court’s judgment awarding compensatory damages and statutory penalties in favor the plaintiff, Chalmette Retail Center, L.L.C. [“CRC”]. For the reasons that follow, we affirm in part, modify in part, and reverse in part.
 

 
 *489
 
 FACTS AND PROCEEDINGS BELOW
 

 CRC is a limited liability corporation owned by a father and son team, Paul Dorsey, Jr. and Paul Dorsey, III. CRC owns and operates a retail shopping center located at 8400 West Judge Perez Drive in Chalmette, Louisiana. At all pertinent times, this property was insured against wind and fire hazards under, a commercial policy issued by Lafayette.
 

 The property, formerly a Schwegmann’s grocery store, was purchased by the Dor-seys in 2003 and substantially renovated. In July, 2005, the Dorseys opened the retail center containing four separate businesses: a self-storage rental facility operated by CRC; and three tenants: Stage, Aaron Rents and Dollar General. On | ¡August 29, 2005, the retail center was extensively damaged by Hurricane Katrina, incurring both wind and flood damage.
 
 [1]
 

 On or about September 9, 2005, CRC asserted a claim under its Lafayette policy for the damage to its retail center caused by Hurricane Katrina. In January, 2006, CRC provided Lafayette with documentation to support the business interruption portion of its claim, including amounts claimed as “extra expenses” under the policy. On March 15, 2006, Lafayette tendered to CRC the amount of $1,167,903.32, in consideration of which the parties entered into a release entitled “Policyholder’s Release of All Building Loss Claims.” It is undisputed that in this settlement document, CRC released its claim for “Building Loss or Property Loss” but explicitly reserved the right to pursue its “Business Income” claim under the Lafayette policy.
 
 [2]
 
 On June 7, 2006, Lafayette paid CRC the sum of $66, 902 to cover the undisputed portion of CRC’s business income claim.
 

 On August 29, 2006, CRC filed a petition in the district court alleging that Lafayette had arbitrarily and capriciously failed to pay CRC’s business interruption claim within thirty days of having received satisfactory proof of loss, in violation of La. R.S. 22:658. On account of Lafayette’s alleged bad-faith breach of the insurance contract, CRC sought as damages the amount it should have received under the policy, unspecified further damages it had incurred as a result of Lafayette’s breach, and a penalty of two times “the amount of said damages” pursuant to La. R.S. 22:658 and La. R.S. 22:1220.
 

 laOn May 2, 2008, Lafayette moved for partial summary judgment dismissing CRC’s claim for extra expenses under the policy; Lafayette contended that in the 2006 release, CRC had reserved only its business income claim and therefore had released all other claims, including extra expenses, penalties and attorney’s fees. The trial court denied the motion.
 
 [3]
 
 Lafayette applied to this court for supervisory writ, which was denied on the basis that the relator had an adequate remedy on
 
 *490
 
 appeal.
 
 [4]
 
 The Louisiana Supreme Court also denied writs.
 
 [5]
 

 The matter was tried to a jury in the district court from July 21-28, 2008. The jury was given ten interrogatories, pursuant to which they found as follows:
 

 (Int. # 1 and # 2) CRC sustained a net business income loss of $226, 223.00 over and above the $66,902.00 that had been paid by Lafayette.
 

 (Int. # 3 and # 4) CRC sustained extra expenses as defined in the policy in the amount of $765,000.00.
 

 (Int. # 5 and # 6) Lafayette violated the terms of La. R.S. 22:658 by failing to initiate loss adjustment within 30 days of notification of loss by the insured, for which violation CRC was entitled to penalties in the amount of $1,992,446.00.
 

 (Int.# 7) Prior to August 15, 2006,
 
 [6]
 
 Lafayette violated the terms of La. R.S. 22:658 by arbitrarily and capriciously failing to pay or make a written offer |4to settle the insurance claim within 30 days after receipt of satisfactory proof of loss.
 

 (Int.# 8) The amounts that Lafayette failed to pay within 30 days pursuant to Int. # 7 include: $1,167,000.00 for building loss; $765,000.00 for extra expenses; and $226,223 for business income loss.
 

 (Int.# 9) After August 15, 2006, Lafayette violated the terms of La. R.S. 22:658 by arbitrarily and capriciously failing to pay or make a written offer to settle the insurance claim within 30 days after receipt of satisfactory proof of loss.
 

 (Int.# 10) The amounts that Lafayette failed to pay within 30 days pursuant to Int. # 9 include: $765,000.00 for extra expenses; and $226,223.00 for business income loss.
 

 On August 25, 2008, the trial court rendered written judgment against Lafayette in accordance with this jury verdict, awarding to CRC the following amounts:
 

 (1) $991,223 in damages under the insurance contract, including:
 

 a. $226,223.00 — “Business Net Income;” and
 

 b. $765,000.00 — “Extra Expenses;”
 

 (2) $3,017,502.25 in statutory penalties, including:
 

 a. $1,982, 446.00 for failing to initiate loss adjustment within 30 days pursuant to La. R.S. 22:658;
 

 | fib. $539,444.75 for arbitrarily and capriciously failing to pay the insurance claim within 30 days pursuant to La. R.S. 22:658, prior to its amendment in 2006; and
 

 c. $495,611.50 for arbitrarily and capriciously failing to pay the insurance claim within 30 days pursuant to La. R.S. 22:658 as amended effective August 15, 2006;
 

 (3) Pre-judgment and post-judgment interest, all costs associated with the proceedings, and reasonable attorney’s fees.
 

 Lafayette timely noticed its suspensive appeal of this judgment.
 

 
 *491
 
 ISSUES
 

 On appeal, Lafayette contends the trial court committed six errors:
 

 (1) The failure to properly interpret and give effect to the March 15, 2006 release signed by the parties;
 

 (2) The improper awarding of damages for business income loss to CRC;
 

 (3) The improper awarding of damages for extra expenses to CRC;
 

 (4) The improper awarding of statutory penalties against Lafayette for the failure to initiate loss adjustment within the time limits prescribed by La. R.S. 22:658(A)(3);
 

 (5) The improper awarding of statutory penalties against Lafayette for its failure to pay the claim timely under two versions of La. R.S. 22:658(B)(1), both prior and subsequent to the statute’s amendment in 2006;
 

 |(i(6) The denial of Lafayette’s mid-trial motion for a mistrial on account of judicial misconduct.
 

 We address each issue separately.
 

 DISCUSSION
 

 I.
 
 Interpretation and Effect of Release
 

 Lafayette argues that the trial court erred by failing to find that CRC released its claims for extra expenses and statutory penalties in the document signed March 15, 2006. The release, signed by Paul Dorsey, III, on behalf of CRC, states, in pertinent part:
 

 POLICYHOLDER’S RELEASE OF ALL BUILDING LOSS CLAIMS
 

 IN CONSIDERATION of the payment of
 
 One million, one hundred sixty-seven thousand nine hundred three and 32/100
 
 ($1,167,903.32) DOLLARS ... the Undersigned do hereby ... completely release, acquit and forever discharge Lafayette Insurance Company ... of and from ALL rights, claims and causes of action of every kind and nature whatsoever, "without reservation, limitation, or exception, together with all lawsuits, obligations, losses through condemnation or governmental action, costs, expenses, statutory penalties, attorney’s fees, breaches of the insurance contract, and damages of every kind and nature whatsoever ... which the Undersigned now has or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen damages and the consequences thereof, resulting or to result from or in any way related to the events which occurred.
 

 On or about August 29, 2005, and the days and weeks thereafter, when Hurricanes Katrina and Rita, and other events, including possible third party negligence and fault, occurred in New Orleans and the surrounding areas, municipalities, and parishes as a result of which the Undersigned alleged [sic] sustained damages to the insured property located at 8400 W. Judge Perez Dr., Chalmette Louisiana, 70043.
 

 IT IS MUTUALLY AGREED AND UNDERSTOOD: This settlement is the compromise of doubtful and disputed claims.... This release contains the entire agreement between the parties hereto. The undersigned is and shall be solely responsible for the repair of the insured location and premises; and for the payment of all costs of repair or replacement, liens, mortgages, and attorney’s fees.
 

 17This agreement is regarding the Building Loss or Property Loss only for the building located at 8400 West Judge Perez Drive, Chalmette, LA. This payment is not in consideration of any Business Income claim that the Undersigned may have and the Insured reserves the right to pursue a Business Income Claim.
 

 
 *492
 
 Lafayette contends that because under the language of the release, CRC clearly and unambiguously released all claims under the insurance contract except for business income, the trial court committed legal error by allowing CRC to put on evidence at trial regarding its claims for extra expenses and statutory penalties. Conversely, CRC argues that the trial court did not err because the only claims released were those falling under the category of building loss/ property damage; whereas “extra expenses” and statutory penalties (at least insofar as they penalize Lafayette’s conduct in handling CRC’s claims for extra expenses and/or business income) were not released.
 

 The release at issue is a compromise, which is defined in the Louisiana Civil Code as “a contract whereby the parties, through concessions made by one or more of them, settle a dispute or uncertainty concerning an obligation or other legal relationship.” La. C.C. art. 3071. A compromise must be in writing, or be recited in open court and capable of being transcribed. La. C.C. art. 3072. A compromise precludes the parties from bringing a subsequent action based upon the matter that was compromised. La. C.C. art. 3080.
 

 The compromise instrument is the law between the parties and must be interpreted according to the parties’ true intent.
 
 Ritchey v. Azar,
 
 383 So.2d 360, 362 (La.1980). The compromise instrument is governed by the same general rules of construction applicable to contracts.
 
 Brown v. Drillers, Inc.,
 
 93-1019 (La.1994), 630 So.2d 741, 748. La.C.C. art.2046 sets forth the general rule of construction, providing that “[w]hen the words of a contract are clear and explicit |Rand lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” As noted by the Louisiana Supreme Court, the use of the word “further” in article 2046 is significant. Because the determination that the language contained in a contract is clear and explicit, in itself, involves an interpretive process, the Code article emphasizes that the process involves no
 
 further
 
 interpretation, as opposed to no interpretation at all.
 
 Brown,
 
 630 So.2d at 748.
 

 In addition to the general principle of construction expressed by La. C.C. art.2046, La. C.C. art. 3076 provides a specific rule applicable to compromise agreements, stating that a compromise “settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express.” As with all contracts, each provision in a compromise agreement must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art.2050. Courts are to be guided by the general principle “that the contract must be construed as a whole and in light of attending events and circumstances.”
 
 Brown,
 
 630 So.2d at 748 (citing
 
 Succession of Teddlie,
 
 385 So.2d 902, 904 (LaApp. 2d Cir.),
 
 writ refused,
 
 393 So.2d 742 (La. 1980). Thus, the intent which the words of the compromise instrument express in light of the surrounding circumstances at the time of execution of the agreement is controlling.
 
 Brown,
 
 at 748.
 

 When, as in the instant case, the plaintiff does not attack the validity of the release but rather contends that the scope of the release does not extend to the claims being asserted, the party interposing the release as a defense (in this case, Lafayette) has the burden of proving that those claims are included in the release.
 
 Broum,
 
 at 747-48.
 

 | aThe meaning and intent of the parties to a written instrument, including a compromise, is ordinarily determined from
 
 *493
 
 the four corners of the instrument, and extrinsic (parol) evidence is inadmissible either to explain or to contradict the terms of the instrument.
 
 Brown,
 
 at 748 (citing
 
 Maltby v. Gauthier,
 
 526 So.2d 455, 457 (La-App. 5th Cir.),
 
 writ denied,
 
 531 So.2d 474 (La.1988);
 
 Smith v. Leger,
 
 439 So.2d 1203 (LaApp. 1st Cir.1983). However, in a line of cases beginning with
 
 Moak v. American Standard Automobile Ins. Co.,
 
 242 La. 160, 134 So.2d 911 (1961), the Louisiana courts have crafted a jurisprudential exception to this rule; under this exception, applicable only to compromise instruments, when the scope of a compromise is at issue, extrinsic evidence can be considered to determine exactly what differences the parties intended to settle.
 
 Brown,
 
 at 748-49. Nevertheless, the courts have limited the application of this jurisprudential exception to cases “in which substantiating evidence is presented establishing either (1) that the releasor was mistaken as to what he or she was signing, even though fraud was not present; or (2) that the releasor did not fully understand the nature of the rights being released or that the releasor did not intend to release certain aspects of his or her claim.”
 
 Brown,
 
 at 749 (citing
 
 Higgins v. Spencer,
 
 531 So.2d 768, 772 (LaApp. 1st Cir.),
 
 unit denied,
 
 532 So.2d 106 (La.1988). When the factual circumstances surrounding the execution of the release instrument do not fall within either of the above two categories, Louisiana courts generally confine their analysis to the four corners of the instrument.
 
 Brown,
 
 at 749 (citations omitted). Moreover, when a release can be construed from the four corners of the document without considering extrinsic evidence, the question of contractual interpretation is answered as a matter of law.
 
 Brown,
 
 at 749-50 (citing
 
 Wilson v. Cost Plus of\wVivian) Inc.,
 
 375 So.2d 683, 685 (LaApp. 2d Cir.1979);
 
 Horton v. Mobley,
 
 578 So.2d 977, 982 (LaApp. 2d Cir.1991).
 

 In the instant case, the record contains no evidence that Paul Dorsey, III, who signed the release on behalf of CRC, was mistaken as to what he was signing or did not fully understand the rights he was relinquishing. To the contrary, the record reflects that Mr. Dorsey is an attorney and that CRC was represented by counsel at the time the release was signed. Therefore, in determining whether the trial court erred as a matter of law in interpreting the release, we first consider the language of the release itself. That language unequivocally includes the release of CRC’s entire claim for building loss and or property damage. At issue is the meaning of the release with regard to extra expenses, statutory penalties and attorney’s fees.
 

 1.
 
 Extra Expenses
 

 Extra expenses are not specifically mentioned in the release. However, like “Business Income,” “Extra Expense” is an item of coverage listed in the insurance policy under the heading “Additional Coverages.” Lafayette contends that because CRC released “ALL rights, claims and causes of action of every kind and nature whatsoever,” expressly reserving only its business income claim, the trial court erred by allowing CRC to introduce evidence in support of its claim for extra expenses, which are not listed under the category of “Business Income” in the policy. Conversely, CRC argues that its claim for extra expenses was preserved because extra expenses, which by definition are amounts spent to reduce the amount of the insured’s business income loss, are intrinsically related to and therefore should be considered a part of CRC’s business income claim.
 

 | nBoth arguments are well-considered. However, under the circumstances presented in the instant ease, we find it un
 
 *494
 
 necessary to resolve the issue. Whether the trial court erred by allowing CRC to introduce evidence on its claim for extra expenses is of no consequence in light of our finding, discussed
 
 infra,
 
 that CRC failed to prove that any of the evidence introduced at trial fit the definition of an “extra expense,” as that term is used in the insurance policy.
 
 [7]
 
 Therefore, we pre-termit the issue of whether the release should have precluded the introduction of this evidence.
 

 2.
 
 Statutory Penalties and Attorney’s Fees
 

 Unlike extra expenses, statutory penalties and attorney’s fees are explicitly mentioned in the first paragraph of the release as being among the claims relinquished. On this basis, Lafayette contends that the trial court committed legal error by submitting the issues of statutory penalties to the jury. Conversely, CRC argues that the trial court did not err by awarding penalties and attorney’s fees. Essentially, CRC maintains that the inclusion of penalties and attorney’s fees in the first paragraph of the release is qualified by the fourth paragraph, which restricts the applicability of the agreement to “Building Loss or Property Loss only for the building located at 8400 West Judge Perez Drive, Chalmette, LA” and provides that the insured reserves its right to pursue a business income claim. According to CRC’s argument, claims for statutory penalties and attorney’s fees are not precluded by the release because they are not part of building/ property loss. In our view, neither party’s argument is completely correct.
 

 Unlike extra expenses, penalties and attorney’s fees are not items of coverage addressed in the insurance policy. Rather, they are legislatively-established,¶ 2 judicially-imposed consequences of an insurer’s bad faith breach of contract. La. R.S. 22:658, the statute establishing the penalties at issue herein, specifies the conduct for which each penalty may be imposed (i.e., the insurer’s failure to initiate loss adjustment within a prescribed time after receiving notification of the loss; or, the insurer’s arbitrary and capricious failure to pay any amount owed within a prescribed time after receiving satisfactory proofs of loss). In our view, the language of the release unequivocally precludes any claim CRC may have for penalties and/or attorney fees due on account of Lafayette’s conduct in handling CRC’s Katrina claim under this particular policy,
 
 except to the extent such penalties may relate solely to Lafayette’s handling of the business income loss.
 
 Statutory penalties that relate only to the recovery of business income, as opposed to the loss in general, reasonably can be viewed as a part of CRC’s reservation of the business income claim. To the extent that such penalties might be due, we find that their award would not be precluded by the release.
 

 As the trial court made three separate penalty awards, our interpretation of the release requires us to go one step further — that is, to determine what specific conduct on the part of Lafayette is being punished by each award — as a prerequisite to deciding the appropriateness of each award. In addition to arguing that all three penalty awards are precluded by the release, Lafayette alternatively asserts various other legal arguments as to the impropriety of each award. Therefore, for the sake of completeness, we address all these issues together in our discussion of Lafayette’s final two assignments of error regarding statutory penalties/ attorney’s fees,
 
 infra.
 

 
 *495
 
 11SII.
 
 Business Income Loss
 

 On this assignment of error, Lafayette contends that the amount of business income loss found by the jury and awarded by the trial court ($226,223.00) is manifestly erroneous. Lafayette argues that in view of the evidence, no reasonable fact finder could have determined that CRC incurred any amount of business income loss on account of Hurricane Katrina.
 

 The insurance policy provides, under the heading “Additional Coverages”:
 

 e. Business Income
 

 We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your “operations” during the “period of restoration.”.... We will pay only for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or damage.
 

 Business Income means the:
 

 (1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
 

 (2) Continuing normal operating expenses incurred, including payroll.
 

 The policy further provides, in section H, paragraph 4, that the “period of restoration” begins “on the date of direct physical loss or damage” and ends “on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.”
 

 Two experts testified at trial with regard to the calculation of CRC’s business income loss. Mr. Ralph Litolff, a C.P.A. and forensic accountant hired by the plaintiffs, testified to the following facts upon which he based his calculations. On August 29, 2005 when the hurricane occurred, the retail center at 8400 West Judge Perez Drive contained a self-storage facility, which was owned and operated by CRC; and three other businesses that were owned and operated by tenants of CRC, namely: Aaron Rents, Stage, and Dollar General. Mr. LitolffJ^testified that he considered twelve months from the date of the storm as the period of restoration because that was the maximum amount of time allowed under the policy. However, he calculated the income loss separately for each of the four retail spaces, basing his calculations upon the date each particular business (or a replacement business) reopened. CRC reopened the self-storage facility on December 1, 2005, which according to Mr. Litolff resulted in a three-month revenue loss of $24,000.00. Dollar General reopened its store on February 10, 2006; Mr. Litolff testified he used a period of 5.36 months and estimated CRC’s lost rental income from that space to be approximately $42,000. Aaron Rents never reopened but was replaced on July 1, 2006 by a NAPA auto parts store, resulting in a loss of rental income to CRC of $56,000.00, according to Mr. Litolffs testimony. Finally, Mr. Litolff calculated that Stage, whose space remained vacant beyond twelve months, resulted in a loss of rental income of $200,000.00 for the twelve-month period. To these figures, Mr. Litolff added CRC’s continuing payroll expenses for the months its self-storage business had remained closed and subtracted CRC’s “saved expenses” (such as the electric bill). After deducting the amount Lafayette had already tendered, Mr. Litolff opined that CRC was still owed approximately $226,000 in business income loss. Finally, Mr. Litolff testified that because the retail center had only been open for one month when the storm hit, the method of calculation used by Joseph Balfour, Lafayette’s expert, was flawed to the extent that it relied upon a comparison of CRC’s income before and after the hurricane.
 

 
 *496
 
 Mr. Balfour, who was also qualified as an expert in forensic accounting, testified on behalf of Lafayette. With regard to the Mr. Litolffs estimate of lost income, Mr. Balfour indicated that he would have deducted an additional |1B$77,000.00 representing the payments CRC had received from its tenants to muck out and clean up their spaces after the hurricane. However, according to Mr. Balfour, even after subtracting this amount, Mr. Litolffs figure would not accurately represent CRC’s business income loss because it failed to take into account approximately $894,000.00 in gross income CRC had received from its self-storage business during the twelve months following the storm.
 
 [8]
 
 Considering this additional income, Mr. Balfour opined that CRC had incurred no business income loss because between December 1, 2005, and September 1, 2006, it had compensated for its loss of rental income by significantly increasing the income being generated from the self-storage facility.
 
 [9]
 

 The jury found that CRC incurred a business income loss of $226,223.00, obviously crediting the testimony of Mr. Litolff and discounting that of Mr. Balfour. On appeal, Lafayette contends that Mr. Litolff “arbitrarily excluded” the income from the self-storage facility in making his calculations, which exclusion resulted in a double recovery by CRC.
 

 The jury’s determination as to the amount of business income loss is a factual finding reviewable under the manifest error standard, which dictates that such a finding may not be disturbed unless it is manifestly 11fierroneous or clearly wrong.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La. 1989). This standard requires that whenever there is conflicting testimony, reasonable inferences of fact should not be disturbed by the appellate court. Likewise, if there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Id.
 
 Credibility determinations, including evaluations of expert testimony, are factual findings.
 
 Id.
 

 In the instant case, the disparity between the opinions of the two experts is caused by a difference in methodology. Mr. Litolff made his calculations using, in effect, a different period of restoration for each of the four businesses that occupied space in CRC. Because he did not include any business income loss for the self-storage facility beyond December 1, 2005, the date that facility reopened, he also did not include any income generated by that facility beyond the same date. Conversely, Mr. Balfour used a twelve-month period of restoration for the entire retail center and therefore included all the income CRC received during that time. Nothing in the policy language, which defines the period of restoration as ending when the property “should be repaired, rebuilt, or replaced” indicates that either expert’s method of calculation is unacceptable. Neither expert testified as to what factors influenced his determination regarding the period of restoration. However, we cannot say that Mr. Litolffs choice to use the date that each business actually reopened in calculating a separate period for each retail space is unreasonable in light of the evidence, which indicated that some spaces became usable faster than others. For
 
 *497
 
 instance, the testimony indicated that the self-storage facility could be reopened with only minimal lighting, whereas the other businesses would require additional utilities, such as air conditioning and heat. Moreover, some parts of the retail center received more extensive damage than others and therefore took longer to repair.
 

 Under the circumstances, we find no manifest error in the jury’s determination that CRC incurred $226,223.00 in unreim-bursed business income 117loss. We therefore decline to disturb the trial court’s award of that amount as damages.
 

 III.
 
 Extra Expenses
 

 The jury determined that CRC had incurred $765,000.00 in “extra expenses” covered by the policy. Lafayette contends that this amount should be zero. Alternatively to arguing that CRC’s assertion of an extra expense claim is precluded by the release, Lafayette contends that CRC failed to prove at trial that it incurred any “extra expenses,” as that term is defined by the insurance policy.
 
 [10]
 

 Regarding this issue, the policy provides, under the heading Additional Coverages:
 

 f. Extra Expense
 

 We will pay necessary Extra Expense you incur during the “period of restoration” that you would not have incurred if there had been no direct physical loss or damage to property at the described premises ... caused by or resulting from a Covered Cause of Loss.
 

 We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage.
 

 Extra expense means the expense incurred:
 

 (1) To avoid or minimize the suspension of business and to continue “operations”:
 

 (a) At the described premises; or
 

 (b) At replacement premises or at temporary locations, including:
 

 (i) Relocation expenses; and
 

 (ii) Costs to equip and operate the replacement or temporary locations.
 

 (2) To minimize the suspension of business if you cannot continue “operations.”
 

 (3) (a) To repair or replace any property; or
 

 (b) To research, replace or restore the lost information on damaged valuable papers and records;
 

 To the extent that it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional coverage e, Business Income.
 

 1 isThe policy also addresses extra expenses in the section entitled “Loss Payment,” subsection “Valuation,” as follows:
 

 g. Loss under Extra Expense will be determined based on:
 

 (1) All expenses that exceed the normal operating expenses that would have been incurred by “operations” during the “period of restoration” if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:
 

 (a) The salvage value that remains of any property bought for temporary use during the “period of restoration” once “operation” are resumed; and
 

 
 *498
 
 (b) Any Extra Expense that is paid for by other insurance ...
 

 (2) All necessary expenses that reduce the Business Income loss that otherwise would have been incurred.
 

 At trial, CRC took the position that any business-related expense it paid prior to the date of the settlement and release, including money spent to repair the building itself, was covered by the “Extra Expense” provisions of the policy. Lafayette contends that a plain reading of the policy vitiates CRC’s position.
 

 As the Louisiana Supreme court has recently noted, interpretation of an insurance policy usually involves a legal question.
 
 Sher v. Lafayette Insurance. Company,
 
 07-2441, 07-2443, p. 5 (La.4/8/08), 988 So.2d 186, 192. The Court went on to state:
 

 An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. The judicial responsibility in interpreting insurance contracts is to determine the parties’ common intent. Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.
 

 An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Unless a policy conflicts with statutory provisions or public 119poIicy, it may limit an insurer’s liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes.
 

 Id.,
 
 p. 5, 988 So.2d at 192-193 (quoting
 
 Huggins v. Gerry Lane Enterprises, Inc.,
 
 06-2816 (La.5/22/07), 957 So.2d 127, 128-29).
 

 In the instant case, the trial court left the interpretation of the insurance policy to the jury.
 
 [11]
 
 Our task, therefore, is to determine whether the evidence supports the jury’s determination that Lafayette owes CRC $765,000.00 in “extra expenses” covered by the policy. Because we conclude that no reasonable view of the evidence could support the jury’s determination, we find it to be manifestly erroneous.
 

 The policy at issue is not ambiguous regarding what constitutes an “extra expense.” Taken together, the above-quoted policy provisions make it clear that an “extra expense” is by nature a temporary expense: one that makes it possible for the insured to maintain business operations that otherwise would have been interrupted pending permanent repair/restoration of the insured’s property. Hence, the policy provides for the deduction of the “salvage value” of equipment purchased for temporary use. Moreover, under the policy, an extra expense is clearly an extraordinary expense, one that “exceeds the normal operating expenses,” such as the costs associated with temporarily relocated the business to somewhere other than the insured premises.
 

 12QAt trial, CRC introduced into evidence three binders containing thousands of re
 
 *499
 
 ceipts, invoices, and other records it claimed to be extra expenses.
 
 [12]
 
 From the face of the documents alone, it is impossible to determine which ones, if any, represent expenses that would qualify as “extra expenses” under the policy. Some clearly appear to be amounts spent to make permanent repairs to the building, rather than extra expenses. However, CRC made no attempt to show that any of the individual documents reflected an extra expense as defined by the policy. Instead, Paul Dorsey, III testified that he believed “any expense that we incurred after Katrina to get back into business was an extra expense.” He also testified that by the time of the March 15, 2006 settlement with Lafayette, he and his father had spent about $800,000 in repairs to the retail center, noting that his CPA had kept track of “every penny we spent on that building.” Moreover, Mr. Dorsey testified that when he accepted Lafayette’s offer to settle on March 15, 2006, he was agreeing to settle, as he understood it, “the remaining building damages.”
 
 [13]
 
 Linda Stockton, the controller for CRC from its inception, testified that after the storm, she was instructed by Mr. Dorsey to put together “all” the post-Katrina expenses and to give those documents to Mr. Litolff. Mr. Litolff testified that he received four boxes of records from Ms. Stockton. From those documents, Mr. Litolff prepared his report after determining which documents related to extra expenses and which related to CRC’s business income loss. In determining the amount of extra expenses, Mr. Litolff testified he first eliminated items he believed were not covered by the policy, such as items on Mr. Dorsey’s personal credit card |2i statements that were not related to CRC, and other costs that were not “relevant to the restoration of CRC.” According to Mr. Litolffs testimony, he then subtracted from the remaining invoices all those dated after March 15, 2006, to arrive at a figure of $765,000.00, which he opined was the amount of extra expenses CRC had incurred. When asked, on cross-examination, why he had used the date of the settlement, rather than the date the “period of restoration” ended, as the cutoff date for the extra expenses, Mr. Litolff indicated that he used that cutoff date because extra expenses are “what the insured has paid personally.” He continued to opine that once the insured had been given funds for “open remaining damages,” the insured could no longer incur extra expenses.
 

 Conversely, Lafayette’s expert, Mr. Balfour, testified that, in his appreciation, extra expenses under the policy were “extraneous” expenses that would not normally occur, such as the insured’s having to rent an office trailer until his damaged office could be repaired. When asked whether it was his opinion that the Dorsey’s were not entitled to extra expenses, Mr. Balfour responded that he believed the Dorsey’s were not entitled to the ones they had listed or requested. He noted specifically that nothing the Dorsey’s had spent to rebuild their building qualified as
 
 *500
 
 an extra expense. In addition, Michael Stewart, the corporate representative of Lafayette, testified that expenses incurred to repair the insured’s building could be considered as “extra expenses”
 
 only
 
 if they had not been paid as building repair costs under the building loss coverage.
 

 Moreover, although CRC never put forth any evidence, other than the invoices themselves, to prove that any particular item included in Mr. Litolffs estimate factually qualified as an “extra expense” in terms of the policy, Lafayette did introduce testimony to show that certain of these items would not qualify. David Pay-ton, an independent catastrophe adjuster who worked for Property Loss Consultants [hereinafter “PLC”], which was hired by Lafayette to assist with Katrina claims, testified that he was the adjuster assigned to CRC’s claim. Mr. Payton testified that “extra expenses” included anything used to mitigate further damage to the building, such as a blue tarp roof, as well as expenses incurred to mitigate the business income loss, such as the cost of moving a business to the building next door. He also testified as to why, when preparing his damage estimates, he had decided that certain items on a list of “extra expenses” given to him by CRC did not qualify extra expenses. For instance, Mr. Payton testified that the rental of bobcats, generators, and temporary toilets by the contractor doing repair work on CRC’s building were not “extra expenses” because he had included these items as part of the contractor’s overhead in his estimate of CRC’s property damage. Similarly, invoices for paint and building supplies from Home Depot, a new sprinkler system for the building, and $12,000 in electrician services were included in the property damage estimate. Mr. Payton noted that these items could only be paid once, either as part of property damage claim or as extra expenses.
 
 [14]
 
 Mr. Payton also testified that he excluded certain other items on CRC’s list, such as elevator testing and pressure washing, from his estimate because they related to flood damage, an exclusion under the policy. Finally, Mr. Payton testified he excluded some items, such as an invoice from “Elkins PLC” for legal research andj^one from “Jamis International” for the building of additional new storage units, because they were not covered by the policy at all.
 

 Considering the entire record, we find that CRC failed to submit any evidence to support Mr. Litolffs opinion that CRC incurred $750,000 in “extra expenses” as provided for under the policy. Mr. Li-tolffs own explanation of the methodology he used to determine this figure confirms the absence of any consideration of the actual policy language regarding “extra expenses.” For instance, despite the policy stipulation that extra expenses are incurred during the period of restoration, Mr. Litolff used the date of the property damage settlement as the cutoff date for his calculation. Indeed, both he and Mr. Dorsey, III, expressed the view that “extra expenses” included
 
 any
 
 expenses the Dorsey’s paid
 
 prior to the date of the property damage settlement
 
 to get their retail center back into operation. This viewpoint, although it may have influenced the jury’s determination, simply does not comport with the policy provisions. Nor does this viewpoint comport with the language of the release, which unequivocally indicates that CRC was releasing its entire building loss claim, not just “the remaining damages” and was thereafter to be solely
 
 *501
 
 responsible for further repairs to the building. Accordingly, because of the absence from the record of any evidence to support the jury’s finding that CRC incurred $750,000 in “extra expenses” under the policy, we conclude that this finding is manifestly erroneous. We therefore reverse the trial court’s award of extra expenses.
 

 IV.
 
 Statutory Penalties
 

 The trial court awarded penalties under two different parts of La. R.S. 22:658; one provision of the statute penalizes an insurer for the failure to timely initiate loss adjustment of a property damage claim, and other provisions penalize |2l|an insurer for the failure to pay, or make a written offer to settle, a property damage claim within thirty days after receipt of satisfactory proofs of loss. Lafayette contends the trial court committed legal error in making these awards. We address each type of penalty award separately.
 

 1.
 
 Failure to Initiate Loss Adjustment
 

 La. R.S. 22:658(A)(3) provides:
 

 Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim and of a claim for reasonable medical expenses within fourteen days after notification of loss by the claimant. In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant. Failure to comply with the provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1220.
 

 La. R.S. 22:1220 imposes an affirmative duty of good faith and fair dealing upon insurers in their handling of claims, requiring that they “adjust claims fairly and promptly” and “make a reasonable effort to settle claims.” It further provides that an insurer who breaches this duty “shall be liable for any damages sustained as a result of the breach.” The penalty portion of the statute, 22:1220(0, states, in pertinent part:
 

 C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater....
 

 In the instant case, the jury was presented with two interrogatories relating to this issue. The jury answered “Yes” to the question: “Do you find that Lafayette violated the terms of La. R.S. 22:658 by failing to initiate loss adjustment within thirty (30) days after notification of loss by the insured?” In response to the next | gdnterrogatory, “Enter the amount of penalties you award.”, the jury wrote “1,982,-446.00.”
 

 Lafayette argues that the trial court erred by allowing CRC to present evidence at trial regarding Lafayette’s alleged breach of its duty to timely initiate loss adjustment of CRC’s Katrina claim. According to Lafayette, it was legal error to permit this evidence because CRC had unequivocally released any claim it might have had for penalties as a result of such a breach.
 
 [15]
 
 We agree.
 

 For the reasons already stated, we find that the release clearly precludes any claim for penalties relating to Lafayette’s handling of the building loss claim. More
 
 *502
 
 over, we find that the above-quoted provision in La. R.S. 22:658(A)(3) regarding the insurer’s duty “to initiate loss adjustment of a property damage claim” within so many days of “notification of loss” refers to the
 
 entire
 
 claim made by an insured as a result of a catastrophe or other loss-causing event. When an insured makes the initial contact with his insurer to notify the insurer of a loss, as CRC did within ten days of the hurricane’s landfall, that communication puts the insurer on notice as to the existence of a claim for any and all compensation the insured may be due under the applicable policy, including property damage, business income loss, extra expenses, and whatever else may be provided for in the policy. When this notification is made, the insured often does not yet know the extent of the loss, of which he eventually will be required to submit proof. The statute clearly does not contemplate separate notifications of loss for various parts of a property damage claim, and interpreting it to do so would be absurd.
 

 |2|jThus, in the instant case, there can be no award of penalties under La. R.S. 22:658 for Lafayette’s failure to timely initiate loss adjustment of
 
 only
 
 the business income portion or
 
 only
 
 the extra expenses portion of its claim, because the notification of loss provision applies to the whole claim. In the March 15, 2006 settlement agreement, CRC expressly released the building/ property loss claim, including any claim for statutory penalties related to it.
 

 The interpretation of the release agreement, as well as the interpretation of the penalty statute, are issues of law reviewed under a
 
 de novo
 
 standard. See
 
 Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc.,
 
 06-0582, p. 9, (La.11/29/06), 943 So.2d 1037, 1045. Therefore, we find the trial court committed legal error by allowing extensive evidence regarding the timeliness of Lafayette’s initiation of loss adjustment to be introduced at trial and by submitting the issue of statutory penalties for Lafayette’s conduct in initiating loss adjustment to the jury. Accordingly, we vacate the jury’s responses to Interrogatories No. 5 and No. 6, and reverse the trial court’s award of $1,982,446.00 in penalties.
 

 2.
 
 Failure To Pay Claim After Receipt of Satisfactory Proof of Loss
 

 With regard to this issue, prior to its amendment effective August 15, 2006, La. R.S. 22:658 provided, in pertinent part:
 

 A. (1) All insurers issuing any type of contract ... shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
 

 [[Image here]]
 

 (4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.
 

 [[Image here]]
 

 B. (1) Failure to make such payment within thirty days after ^receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively ... when such failure is found to be arbitrary, capricious or without probable cause, shall subject the insurer to a penalty, in addition to the.amount of the loss, of twenty-five percent damages on the amount found to be due from the
 
 *503
 
 insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.
 

 In 2006, the legislature amended the above-referenced part (B)(1) of the statute to provide for a penalty of fifty percent, rather than twenty-five percent, of the amount found to be due from the insurer to the insured, as well as “reasonable attorney fees and costs.” The amendment became effective August 15, 2006.
 
 [16]
 

 The trial court in the instant case submitted four interrogatories to the jury on the issue of penalties owed by Lafayette for its alleged failure to comply with the statutory duty set forth the above-quoted portion of La. R.S. 22:658.
 
 [17]
 
 The first of these, Interrogatory No. 7, asked the jury: “Do you find that Lafayette Insurance Company, prior to August 15, 2006 violated the terms of La. R.S. 22:658 by arbitrarily, capriciously and without probable cause fail [sic] to pay or offer to pay in writing to settle the insurance claim within thirty (30) days after receipt of a satisfactory proof of loss?” The jury answered “Yes.” The next question, No. 8, asked the jury to enter what sum, if any, in each of three listed categories, did it find Lafayette had failed to pay within thirty days after receipt of satisfactory proof of loss. The three categories listed, and the amounts the jury wrote next to each, 12swere as follows: (1) Building Loss, $1,167,000.00; (2) Extra Expenses, $765,000.00; and (3) Business Income Loss, $226,223.00.
 

 Next, Interrogatory No. 9 posed exactly the same question as did No. 7, except the phrase
 
 “before
 
 August 15, 2006” was changed to
 
 “after
 
 August 15, 2006.” The jury also answered No. 9 in the affirmative. Finally, Interrogatory No. 10 was identical to No. 8, except only two categories were listed: “Extra Expenses” and “Business Income Loss” (eliminating the “Building Loss” category). For these two categories, the jury wrote the same amounts it had written in response to Interrogatory No. 8.
 

 Based on these responses, the trial court awarded CRC $539,444.75
 
 [18]
 
 in penalties for Lafayette’s violation of the statute before the effective date of its amendment and $495,611.50
 
 [19]
 
 in penalties, plus attorney’s fees, for Lafayette’s violation of the same statute as amended.
 

 Lafayette contends that the trial court erred as a matter of law in awarding these penalties. First, Lafayette argues all claims for penalties by CRC were released in the settlement agreement. Alternatively, Lafayette contends that penalties related to building loss were clearly released and are therefore precluded; that awarding penalties under both versions of the statute has no basis in law; and finally, that CRC failed to prove that Lafayette acted arbitrarily, capriciously or without probable cause.
 

 As stated previously, we do not find that CRC released all rights to claim any penalties, but we do agree with Lafayette that
 
 *504
 
 penalties related to building loss, such as those indicated in jury Interrogatory No. 8, are precluded. Moreover, in |⅞⅛⅛ of our finding that CRC’s claim for extra expenses was not proved at trial, we also must vacate any portion of the trial court’s award of penalties that is based upon Lafayette’s failure to pay extra expenses timely. Therefore, we will consider Lafayette’s two alternative arguments solely in reference to the penalties awarded in conjunction with Lafayette’s failure to pay timely the business income loss.
 

 Addressing the first of these two arguments, we find that, in the instant case, the awarding of penalties under both the prior and the amended versions of La. R.S. 22:658 has no basis in the law nor any precedent in the jurisprudence. This anomalous approach, were we to sanction it, would effectively assess the insurer a penalty of seventy-five percent of the applicable damages for the same breach of conduct, a result we believe was not contemplated by the legislature.
 

 The record reflects that CRC notified Lafayette of its claim on September 9, 2005; submitted proof of loss as to the business income claim in January, 2006; and filed its petition seeking damages for the business income loss on August 29, 2006. Thus, the insurer’s breach (failure to pay the claim within thirty days after receipt of the proof of loss) occurred prior to the August 15, 2006 effective date of the amendment; however, the petition was filed after the effective date. In a similar Katrina loss case,
 
 Slier v. Lafayette Insurance Company, supra,
 
 Lafayette, although it did not assert that both versions of La. R.S. 22:658 were applicable, did argue that its petition filed after the amendment’s effective date constituted a separate proof of loss, triggering the application of the amended statute rather than the pre-amendment version.
 
 Id.,
 
 p. 13, 988 So.2d at 198. Considering this issue, the Louisiana Supreme Court held:
 

 lanHere, although an insurer has a continuing duty of good faith and fair dealing which extends throughout the litigation period, the claim first arose prior to the amendment of R.S. 22:658. Because the duty is a continuing one, had plaintiff not first made satisfactory proof of loss prior to the amendment of R.S. 22:658, his petition for damages served after the amendment became effective could have served as satisfactory proof, thereby triggering the time period set forth in the statute and could have subjected Lafayette to the penalties contained in the amendment because the claim would have first arisen
 
 after
 
 the amendment. Further, again because the duty is a continuing one, had plaintiff made satisfactory proof of loss prior to the amendment and had Lafayette paid that claim, and had plaintiff discovered new damage and made satisfactory proof which Lafayette failed to pay within the time period contained in the statute, but after the amendment became effective, Lafayette could have been subject to the penalties contained in the amendment because the claim would have arisen
 
 after
 
 the effective date of the amendment. Neither of those situations is the case here-the claim for the penalties contained within the statute arose
 
 prior
 
 to the effective date of the amendment. Plaintiffs argument that Lafayette’s continuing breach of the duty of good faith and fair dealing made it subject to the increased penalties contained in the amended version of R.S. 22:658 is without merit.
 

 Id.,
 
 pp. 14-15, 988 So.2d at 199.
 
 [20]
 

 
 *505
 
 Regarding this issue, we find no significant distinction between the facts in the instant case and those in
 
 Sher.
 
 Therefore, we conclude that the trial court erred as a matter of law by submitting the issue of penalties under both versions of La. R.S. 22:658 to the jury because only the pre-amendment version of the statute could have been applicable. We therefore vacate the portion of the trial court’s award ($495,611.50, plus attorney’s fees and costs) that assesses penalties pursuant to the post-amendment version of the statute.
 

 Considering only the assessment of penalties for Lafayette’s failure to pay the business income portion of the claim timely under the pre-amendment version of the statute, we now address Lafayette’s alternative argument: that CRC failed to prove Lafayette’s conduct was arbitrary, capricious or without probable cause.
 

 |slThe evidence reflects that Lafayette received proof of loss for a business income and extra expense claim of approximately $343,000.00 on or about January 18, 2006. Lafayette confirmed it had received and was reviewing these documents approximately one month later, in February. According to the testimony of David Reves, a PLC employee who was working on adjusting the business income portion of the claim for Lafayette, he received all his information from fellow PLC employee Dave Payton, not directly from CRC. Mr. Reves testified that he ultimately recommended to Lafayette that CRC had incurred a business income loss of approximately $67,000.00, and no extra expenses.
 

 On June 7, 2006, Lafayette tendered $66,902.00 in business income loss to CRC. There was some evidence introduced at trial indicating that the delay in making this tender may have been due to the lack of efficient communication between Lafayette and PLC.
 

 On appeal, Lafayette does not explain its failure to tender the $66,902.00 within 30 days. However, Lafayette argues that the amount tendered in June, 2006 was reasonable at that time because Lafayette had offset CRC’s business income loss by the additional income the insured had received from FEMA’s post-Katrina rental of the retail center’s parking lot as a location for its trailers. On January 16, 2008, this court affirmed the trial court’s partial summary judgment holding that Lafayette was not entitled to this offset, citing the policy’s exclusion of the parking lot from coverage. In so holding, we concluded that the instant policy “clearly and unambiguously” provides no coverage for the parking lot.
 
 Chalmette Retail Center
 
 |s2v.
 
 Lafayette Insurance Company,
 
 07-1594, p. 3 (LaApp. 4 Cir. 1/16/08), 974 So.2d 822, 824.
 

 When there are substantial, reasonable and legitimate questions as to the extent of an insurer’s liability or an insured’s loss, the insurer’s failure to pay within the statutory time period is not arbitrary, capricious or without probable cause.
 
 Louisiana Bag Co., Inc., v. Audubon Indem,. Co.,
 
 08-0453, pp. 14-15 (La.12/2/08), 999 So.2d 1104, 1114. However, “when there is a dispute over the extent of coverage afforded by an insurance policy, the insurer bears the risk of misinterpreting its own policy and will be liable for penalties for its errors.”
 
 Id.,
 
 p. 19, 999 So.2d at 1117 (citing
 
 Carney v. Am. Fire & Indem. Co.,
 
 371 So.2d 815, 819 (La.1979)). Therefore, if an insurer errs in interpreting its own insurance contract, that error will not be considered as a
 
 *506
 
 reasonable basis for delaying payment of benefits and will not relieve the insurer of its obligation to pay statutory penalties for the delay.
 
 Id.
 

 Because Lafayette’s decision to offset the parking lot rental income ignored its own policy exclusion, we cannot say it constituted reasonable grounds to delay paying CRC’s full business income loss. Lafayette also argues that its delay in payment should be excused because CRC did not make its “complete claim” until March 8, 2008, approximately three months prior to trial. According to the record, however, it was the extra expense portion, rather than the business income portion, of the claim that CRC dramatically increased based upon the report of its expert. Considering the evidence presented, the jury could have reasonably determined that the business income portion of the claim was not substantially increased prior to trial.
 

 | soUnder the circumstances, we conclude that the jury’s finding that Lafayette arbitrarily and capriciously failed to pay $226,223.00 in business income within thirty days of receipt of proof of loss is not manifestly erroneous. Therefore, under the pre-amendment version of La. R.S. 22:658, the trial court could have legally assessed penalties against Lafayette in an amount equal to twenty-five percent of $226,228.00, or $56, 555.75. For the reasons stated herein, we vacate and reverse the trial court’s award of all penalties beyond this amount, as well as the award of attorney’s fees and costs as penalties.
 

 V.
 
 Denial of Mistrial
 

 Finally, Lafayette argues that the trial court erred by declining to grant its mid-trial motion for a mistrial. At the conclusion of the testimony of Dave Pay-ton, the PLC adjuster handling CRC’s claim for Lafayette, Lafayette moved for a mistrial based upon the trial judge’s alleged improper comments made in the presence of the jury. The record reveals that Mr. Payton, in response to a question regarding why it had taken him until 2006 (more than thirty days from CRC’s notification of loss in September, 2005) to come up with his initial estimate of CRC’s building/property loss, testified:
 

 I don’t want to say nobody was worried about Chalmette; it was just hard to get down here. There was a lot of discussion about dangerous materials. There was a lot of discussion as to what was ever going to happen to this area. We had, you know, bulletins come across the fax: don’t worry about these zip codes right now. Concern yourself with other claims. You know, I had 1500 claims. I had hospitals, I had nursing homes, I had restaurants. When you take a shopping center that has no power and mud everywhere, just debris everywhere, down in an area that, you know — I hate to say it that way — nobody is concerned about it in October or November.
 

 Immediately following this testimony, the following exchange occurred between the trial judge and Mr. Payton:
 

 THE COURT:
 

 l<¡,,Do you know that I lived in this building in October and November? Do you know that we are and were very concerned about it? Everyone of those people in that box have experienced losses and have come back to live here. They love their community. And it is personally offensive to make that suggestion.
 

 THE WITNESS:
 

 I am sorry.
 

 THE COURT:
 

 And on behalf of them, I think you owe them an apology.
 

 
 *507
 
 THE WITNESS:
 

 Well, I do apologize. I didn’t mean it to be offensive. It was just — all the emotions that were going on at the time with everybody. I was spread so thin, and it wasn’t just myself.
 

 Lafayette later moved for a mistrial on the basis that the trial court’s improper comments had inflamed the jury. The trial court denied the motion but instructed the jury to accept Mr. Payton’s apology “completely and unequivocally,” and further to ignore the trial judge’s own comments, stating:
 

 It has no place in your judgment in this case and very probably I shouldn’t have said anything.... Please don’t take into consideration anything I have said in judgment of this case.
 

 La. C.C.P. article 1791 prohibits the judge from commenting upon the facts of the case in the presence of the jury, whether by “commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.” A trial court is afforded vast discretion in determining whether to grant a mistrial.
 
 Boutte v. Kelly,
 
 02-2451, p. 26 (La.App. 4 Cir. 9/17/03), 863 So.2d 530, 549. An appellate court may not disturb a trial court’s denial of a motion for mistrial absent a showing of an abuse of that discretion.
 
 Beaumont v. Exxon Corp.,
 
 02-2322, p. 16 (La.App. 4 Cir. 3/10/04), 868 So.2d 976, 985. In a civil case, the granting of a mistrial is appropriate when no other remedy would provide relief to the moving party, including “proof of prejudicial misconduct occurring during a jury trial which l^cannot be cured by admonition or instructions to the jury.”
 
 Boutte, supra,
 
 p. 26, 863 So.2d at 549 (citations omitted).
 

 In the instant case, Lafayette contends that the trial court’s prejudicial comments so influenced the jury as to render them incapable of fairly weighing the evidence. Lafayette thus argues that the trial court abused its discretion by denying the mistrial. On appeal, Lafayette asks this court to remand for a new trial or alternatively, to strike the jury verdict in its entirety and conduct a
 
 de novo
 
 review of the record.
 

 Although we find the trial court’s comments to be completely improper and in violation of La. C.C.P. art. 1791, we conclude that remand is unnecessary and would be a waste of judicial resources under the circumstances of this case. The judicial comments that were the subject of the motion for mistrial occurred during Mr. Payton’s testimony concerning Lafayette’s alleged failure to timely initiate loss adjustment of CRC’s property damage claim. Because of our conclusion, explained herein, that any testimony on this issue should have been excluded as a matter of law on the basis of the release, we have vacated the jury’s finding of penalties due by Lafayette for this alleged breach. Our reversal of the trial court’s award in this respect, which was the result of
 
 de novo
 
 review, sufficiently cures any prejudicial effect that may have been tainted the jury verdict.
 

 CONCLUSION
 

 Accordingly, for the reasons stated, we affirm the trial court’s award to CRC of $226,223.00 in damages under the insurance contract for loss of business income; we reduce the amount of the trial court’s award of penalties for Lafayette’s arbitrary and capricious failure to pay the claim timely under La. R.S. 22:658 to $56, 555.75; we affirm the award of pre-judgment and post-judgment | ^interest on the total amount ($282,778.75) so affirmed; and we reverse the trial court’s judgment in all other respects.
 

 
 *508
 
 AFFIRMED IN PART, MODIFIED IN PART, AND REVERSED IN PART.
 

 [1]
 

 . The flood damage is not a subject of this appeal. The record reflects that the property was separately insured against flood and that CRC received compensation under that policy-
 

 [2]
 

 . The interpretation of certain other aspects of the release is at issue in this appeal, as discussed
 
 infra.
 

 [3]
 

 . In its May 8, 2008 judgment denying the motion, the trial court stated, in pertinent part:
 

 This Court finds this issue is dependent on a matter of fact concerning the cause of the extra expense loss concern, i.e. wind or water and the coverage for each and further implicates a necessary finding of fact concerning whether the claimed extra expenses were simply repairs under the building loss coverage for which release is given or expenses associated with the minimize [sic] the business interruption loss.
 

 [4]
 

 .
 
 Chalmette Retail Center v. Lafayette Ins. Co.,
 
 08-0880 (La.App. 4 Cir. 7/8/08) (unpublished).
 

 [5]
 

 .
 
 Chalmette Retail Center v. Lafayette Ins. Co.,
 
 08-1550 (La.7/15/08), 986 So.2d 67.
 

 [6]
 

 . The significance of this date is that pursuant to Acts 2006, No. 813, § 1, which became effective August 15, 2006, the legislature amended La. R.S. 22:658(B)(1) to increase the penalty assessed against the insurer from 25% to 50% of the amount found to be due the insured; the amended version also added "reasonable attorney fees and costs" as part of the penalty to be assessed.
 

 [7]
 

 . See our discussion of this issue at pp. 497-501
 
 infra.
 

 [8]
 

 . The record indicates that in March, 2006, CRC's self-storage business was incorporated as a separate entity named Chalmette Self Storage, L.L.C.
 

 [9]
 

 . Mr. Balfour indicated that his opinion at trial differed from that reflected in his written report because the information as to the income from the self-storage facility had been provided to him only after his report had been submitted.
 

 [10]
 

 . Lafayette also argues in its brief that CRC did not plead a claim for extra expenses in its petition, a claim we find unnecessary to address in light of our conclusion that this claim was not proved at trial.
 

 [11]
 

 . Despite the parties' opposing characterizations of the term "extra expense," the trial court avoided making any ruling as to the meaning of that term as used in the policy. Instead, over Lafayette’s repeated objections, the trial court refused to preclude or limit the evidence being presented to the jury as "extra expenses” and often admonished witnesses, both fact and expert, not to testify regarding their interpretation of the policy terms, insisting that the interpretation of the policy was solely the province of the jury.
 

 [12]
 

 . Although they were admitted into evidence at the beginning of trial, the trial judge later ruled that these binders could not go to the jury because CRC's expert, Mr. Litolff, admitted that the binders contained some documents, such as pre-Katrina invoices, that were irrelevant to CRC’s claim.
 

 [13]
 

 . As noted previously, we find that the language of the release unequivocally includes all properly damage to the building, regardless of when such damage was repaired. Moreover, the release explicitly states that CRC “is and shall be solely responsible for the repair of the insured location and premises, and for the payment of all costs of repair or replacement, liens, mortgages and attorney's fees.”
 

 [14]
 

 . According to the testimony of Michael Stewart, Lafayette’s corporate representative, the final property damage estimate Mr. Pay-ton recommended to Lafayette just prior to the March 15, 2006 settlement was in the range of 1.1 million dollars.
 

 [15]
 

 . The record confirms that counsel for Lafayette repeatedly objected to the introduction of such evidence on this basis.
 

 [16]
 

 . See footnote 6,
 
 supra.
 

 [17]
 

 . The record confirms that Lafayette objected to the formulation of the jury interrogatories.
 

 [18]
 

 . This figure equates to twenty-five percent of the sum of the amounts listed by the jury in response to Interrogatory No. 8.
 

 [19]
 

 . This figure equates to fifty percent of the sum of the amounts listed by the jury in response to Interrogatory No. 10.
 

 [20]
 

 . The Supreme Court in
 
 Sher
 
 also considered, and rejected, Lafayette's argument that
 
 *505
 
 the 2006 amendment to La. R.S. 22:658 was "remedial” legislation that should be applied retroactively.
 
 Id.
 
 atpp 199-201, 988 So.2d at 15-18.